GAIDRY, J.
 

 12A physician, sued for medical malpractice, in turn sued his defense attorneys for legal malpractice in their handling of his defense and in facilitating his insurer’s settlement of the malpractice case against him without his knowledge or consent. The defense attorneys appealed a judgment for damages against them. This matter comes to us on remand from the supreme court, following its reversal of our original opinion holding that the plaintiffs cause of action for legal malpractice was perempted. For the following reasons, we reverse the trial court’s judgment and dismiss the action. We further overrule as moot the defendants’ post-remand peremptory exception raising the objections of no cause of action and no right of action.
 

 FACTS AND PROCEDURAL HISTORY
 

 The factual and procedural background of this litigation, prior to the present remand, was briefly set forth in our original opinion and also reviewed in the supreme court’s decision addressing the issue of
 
 *812
 
 peremption.
 
 [1]
 
 Because we now address the merits of the judgment, we again review that background, with some additional detail.
 

 The Medical Malpractice Action
 

 The plaintiff, Michael A. Teague, M.D., is a plastic surgeon maintaining his professional practice in Baton Rouge, Louisiana, as a member of Associates in Plastic Surgery, a professional partnership. From 1994 through 1995, he evaluated and treated Elsie Brown, a licensed practical nurse. On October 18, 1994, Dr. Teague performed surgery |sconsisting of three procedures: a bilateral lower eyelid blepharo-plasty; a forehead lift; and the excision of a cancerous mole.
 

 Ms. Brown claimed that although she had previously given written consent to all three procedures, she originally desired both upper and lower eyelid procedures, and subsequently obtained a second opinion from another surgeon confirming that a forehead lift was not necessary. Ms. Brown contended that she verbally withdrew consent for the forehead lift, thereafter executing an updated written consent for a lower eyelid blepharoplasty in which the forehead lift was not mentioned. Although not directly related to the issue of Ms. Brown’s informed consent for the forehead lift, it was undisputed that Dr. Teag-ue neglected to obtain prior approval for payment of the forehead lift procedure from Ms. Brown’s medical insurer, and that the upper lid blepharoplasty (that had been approved by the insurer) was not in fact performed.
 

 Ms. Brown filed a medical malpractice claim against Dr. Teague and his partnership in 1995. Dr. Teague’s malpractice insurer, St. Paul Insurance Company (St. Paul), assigned the defense of the claim to the law firm of Seale, Smith, Zuber & Barnette, L.L.P., one of the appellants.
 
 [2]
 
 Donald Zuber, one of the firm’s partners and another appellant, acknowledged receipt of the defense assignment by letter of November 8, 1995, expressing the preliminary opinion “that this case will not represent a great deal of exposure on the part of Dr. Teague.” Dr. Teague was sent a copy of that letter. After the medical review panel had unanimously concluded that no breach of professional standards occurred in the course of treatment, Ms. Brown filed suit. Mr. Zuber answered the suit on behalf of Dr. Teague, denying liability and requesting trial by jury. Upon undertaking Dr. 14Teague’s representation, Mr. Zuber initially met with Dr. Teague to discuss the issues, and expressed confidence in mounting a successful defense. He subsequently delegated the handling of the litigation to an associate, Catherine Nobile, also an appellant, but did not formally withdraw from Dr. Teague’s representation.
 

 Pretrial discovery, including the deposition of Ms. Brown, proceeded. Following that deposition in 1997, Mr. Zuber wrote to Dr. Teague to inquire about the availability for deposition of his former nurse-counselor who secured and witnessed the signing of the surgical consent forms. Dr. Teague’s office manager replied, stating that no one in the office knew her current address and that they had “no way of reaching her.”
 

 Ms. Nobile became primarily responsible for the defense of the litigation in 1998. On March 11, 1999, Ms. Nobile notified Catherine Laufer, St. Paul’s adjuster, by
 
 *813
 
 e-mail that the trial court had “issued some tight discovery deadlines in this case, with discovery cutoff on May 1, despite the fact that the case is not yet fixed for trial.” Ms. Nobile recommended the deposition of the physician whom Ms. Brown consulted for a second opinion, as well as the depositions of two other physicians consulted by Ms. Brown. Ms. Laufer responded by email the same day, stating: “[W]e need to get to the bottom of this and if Teague just got carried away -with himself, then we need to determine what it’s worth.”
 

 On April 19, 1999, the trial court issued a case management schedule order, setting a three-day jury trial beginning on January 25, 2000. The order also fixed a deadline of August 1, 1999 for the filing of a jury bond by the defendants. Ms. Nobile wrote to Dr. Teague on April 30, 1999, advising him that the case had been set for a three-day jury trial and the date, commenting: “As you know, these things have a way of disappearing prior |sto trial.” On the same day, Ms. Nobile wrote to Ms. Brown’s attorney, acknowledging the latter’s suggestion of “possible mediation,” and advising that her “client” desired additional discovery and that she would “relay” any settlement offer from Ms. Brown. It is undisputed that Ms. Nobile later failed to file the required jury bond by August 1, 1999, the deadline established in the order, thus resulting in the loss of the right to a jury as the trier of fact. It is further undisputed that although St. Paul was informed of that procedural development, Dr. Teague was not.
 

 On August 30, 1999, Ms. Nobile e-mailed Tara Nice, a St. Paul employee assisting its adjuster, Ms. Laufer, in response to a request for an evaluation relating to the issues of liability and damages. She advised Ms. Nice that no settlement offer had yet been received, and presented the following evaluation on the inquiries as to “Percent Chance to Win,” “Verdict High,” and “Verdict Low”:
 

 Percent chance to win (zero verdict) is 20%.
 

 Verdict High: $20,000-$25,000.
 

 Verdict low: $ 8,500-$12,500.
 

 On September 16, 1999, Ms. Laufer sent a facsimile telecopier message to the Louisiana Patient’s Compensation Fund (PCF), advising the PCF of the trial date and that it was “[djoubtful there will be any impact upon the PCF.” Ms. Laufer also confirmed that St. Paul was “[a]ttempting to settle for
 
 well
 
 under $50,000.”
 
 [3]
 

 On October 27, 1999, Ms. Nobile sent a detailed, updated assessment to Ms. Laufer by e-mail. In that communication, she informed Ms. Laufer that the case’s weaknesses were “sufficiently significant to attempt | ¡¡settlement prior to trial.” Among those weaknesses, according to Ms. Nobile, was the fact that the trial was set before a “notoriously plaintiff-oriented” judge. Ms. Nobile expressed the opinion, however, that because certain facts supported Ms. Brown’s version of events, “judge or jury would find for the plaintiff.” She submitted a revised assessment of liability and damages: “Estimated chance of a zero verdict is 15% .... Realistically, the verdict range could be between $20,000 and $60,000.”
 

 An unexpected opportunity arose to take advantage of an opening in the schedule of a recommended mediator, and on Friday, October 29, 1999, the parties’ attorneys participated in the mediation of the case. It is undisputed that Dr. Teague was, never previously informed that the mediation would take place. As the result of the mediation, a settlement agreement was
 
 *814
 
 reached that day, whereby St. Paul agreed to pay the plaintiff $50,000.00 to compromise her claim against Dr. Teague. That afternoon, Ms. Nobile telephoned Dr. Teague’s office and left a message for him, advising that the case had been settled. Dr. Teague returned Ms. Nobile’s call that same afternoon and confirmed, to his surprise, that the case had been settled as the result of the mediation. On Monday, November 1, 1999, Dr. Teague telephoned Mr. Zuber, discussed the settlement, and expressed, in no uncertain terms, his dissatisfaction with the fact that the case was settled rather than tried.
 

 The Legal Malpractice Action
 

 On November 3, 2000, Dr. Teague instituted this litigation against St. Paul, Ms. Laufer, Mr. Zuber, Ms. Nobile, and Seale, Smith, Zuber & Barnette, L.L.P.
 
 [4]
 
 In his petition, Dr. Teague alleged that an attorney-client relationship existed between him and the defendant attorneys in the prior 17medical malpractice action, that the defendant attorneys failed to properly investigate and defend that action, that they failed to keep him informed of significant developments affecting his interests, that they negligently forfeited his right to trial by jury, and that they engaged in a conspiracy to conceal their professional neglect by effecting the settlement of the medical malpractice claim.
 

 Dr. Teague specifically alleged that his damages “were proximately caused, in whole or in part,” by various intentional and negligent acts and omissions on the part of St. Paul and Ms. Laufer. Dr. Teague further alleged that “[a]s a direct consequence of the settlement,” St. Paul reported the settlement to the National Practitioner Data Bank (the Data Bank).
 
 [5]
 
 Finally, he claimed that as the direct result of the defendants’ negligence and breach of professional duties, he sustained damages consisting of “injury to business reputation, unwarranted expense associated with obtaining malpractice insurance at a higher premium, loss of income, past and future, embarrassment, humiliation, and mental anguish.”
 

 While admitting certain facts alleged in the petition, such as the failure to post the jury bond, the defendants denied any liability.
 

 Dr. Teague subsequently amended his petition to allege that the defendant attorneys violated Rule 1.4 of the Louisiana State Bar Association Rules of Professional Conduct of “by failing to keep [him] advised of all |spertinent developments in his case and by intentionally concealing from him the fact that they had waived his constitutional right to trial by jury through their negligence in failing to post the required jury bond in a timely manner.” He further alleged that St. Paul conspired with the defendant attorneys to conceal
 
 *815
 
 their loss of the right to trial by jury and subsequent settlement negotiations from him.
 

 The case was subsequently tried before a jury on October 17-19, 2005. The jury found the defendants liable to Dr. Teague, assessing 70% fault to Ms. Nobile and 30% fault to Mr. Zuber, and awarded $138,500.00 in damages.
 
 [6]
 
 The trial court’s judgment incorporating the jury’s verdict was signed on November 29, 2005. On December 6, 2005, the defendants filed a post-trial peremptory exception of peremption and prescription, arguing that based upon the evidence at trial, including Dr. Teague’s own testimony, his cause of action was perempted prior to the date he filed suit. The defendants also filed a motion for judgment notwithstanding the verdict on various alternative grounds. The exception and motion were both denied in separate judgments signed on March 10, 2006.
 

 The defendants suspensively appealed, and thereafter filed a peremptory exception of peremption in this court, reasserting that defense. We sustained that exception, finding the legal malpractice action was perempted, and dismissed it with prejudice.
 
 [7]
 
 Dr. Teague applied for supervisory writs, and the supreme court granted his application.
 

 Action of the Supreme Court Following Grant of Writ
 

 The supreme court reversed this court’s judgment on the grounds that Dr. Teag-ue’s knowledge of the “bad result” of which he complained (the ^defendants’ settlement of the medical malpractice claim, which the supreme court also characterized as “the negative result of their representation”) was insufficient to trigger the running of peremption.
 
 Teague v. St. Paul Fire & Marine Ins. Co.,
 
 07-1384, pp. 1-2 (La.2/1/08), 974 So.2d 1266, 1268. The supreme court remanded this matter for us “to dispose of the defendants’ assignments of error that were pretermitted by the court of appeal.”
 
 Id.,
 
 07-1384 at p. 10 n. 3, 974 So.2d at 1273 n. 3.
 

 ASSIGNMENTS OF ERROR AND ISSUES PRESENTED
 

 On remand, the defendants again urge the following assignments of error, not addressed in our prior decision:
 

 1. The trial court erred in allowing judgment to be rendered on evidence which is insufficient as a matter of law.
 

 2. The [trial court] erred in failing to grant JNOY, thus allowing the judgment based on legally insufficient evidence to stand.
 

 3. The trial court below erred in finding plaintiffs evidence sufficient to support an award of general damages, even if such damages are legally recoverable.
 

 4. If any award of damages is legally sustainable, the jury award of $138,500.00 is grossly excessive.
 

 5. The trial court erred in refusing to place St. Paul Insurance Company on the verdict form [for purposes of assessing liability].
 

 6. The trial court erred in failing to charge the jury:
 

 a) that under Louisiana law, a party in a civil matter is not entitled to a jury trial if it is stipulated that damages do not exceed $50,000.00;
 

 
 *816
 
 b) that settlements are favored in Louisiana law;
 

 c) that without a consent to settle clause, St. Paul Insurance Company had absolute authority to settle the [medical malpractice] case.
 

 7. The trial court erred in finding liability as against Donald Zuber.
 

 | mThe defendants have also filed a peremptory exception in this court, raising the objections of no cause of action and no right of action.
 

 The defendants frame the issues raised by their assignments of error as follows:
 

 1. Can an insured under a professional malpractice insurance policy with no “consent to settle” clause claim and recover damages from his defense attorneys if the suit against him is settled without his knowledge or consent?
 

 2. Can a plaintiff in a legal malpractice case who sues for special damages but does not prove them, nevertheless be awarded general damages?
 

 3. Can a plaintiff in a legal malpractice suit who does not sustain economic damages recover general damages when the general damages are not severe, debilitating, and foreseeable such as would be required in an ancillary [sic ] personal injury claim where no physical injury was sustained?
 

 4. Can an attorney be held liable in legal malpractice if he is no longer involved in the case and has no input into or knowledge of a settlement (which forms the basis of plaintiffs complaint) merely because such attorney had not filed a motion to withdraw as counsel or specifically notified the client of the transfer of the case to another attorney within the same firm?
 

 The defendants define the issue raised by their peremptory exception’s objection of no right of action in terms similar to that of the first legal issue listed above:
 

 Can plaintiff herein possess a right of action based on settlement of a lawsuit against him when he has contractually relinquished the right to make a decision regarding settlement to another?
 

 DISCUSSION
 

 As noted in our earlier opinion and that of the supreme court, the policy issued by St. Paul to Dr. Teague did not contain a “consent to settle” clause. Such a “consent to settle” clause has been characterized as “essentially a ‘pride’ provision which gives [the insured] control over litigation which could jeopardize his professional reputation.”
 
 Brion v. Vigilant Ins. Co.,
 
 651 S.W.2d 183, 184 (Mo.App.1983).
 

 Despite the absence of a “consent to settle” clause in the St. Paul policy, Dr. Teague contends that the professional responsibilities and ethical duties imposed upon the defendants by virtue of their representation of him support the existence of an independent cause of action against them and the trial court’s judgment. As we stated in our earlier opinion in this matter, this important substantive issue raised by Dr. Teague’s action appears to be
 
 res nova
 
 in this state. We acknowledged in our earlier opinion the importance of the substantive legal and ethical issues presented, but did not reach them. We are now called upon to address them. In doing so, we will survey relevant jurisprudence of Louisiana and other states and legal doctrine on these issues.
 

 St. Paul’s Exclusive Authority to Settle the Medical Malpractice Claim
 

 St. Paul’s policy contained the following relevant provisions:
 

 
 *817
 
 GENERAL RULES
 

 [[Image here]]
 

 Assignment and Transfers
 

 Neither you [Associates in Plastic Surgery] nor anyone else covered under this policy can assign or turn over your interest in it without our written consent attached to the policy.
 

 [[Image here]]
 

 WHAT TO DO IF YOU HAVE A LOSS
 

 You or other protected persons are required to perform the duties described below when ... an accident or incident happens that could result in liability damages covered under this policy. Failure to comply could affect coverage. The insuring agreements contained in this policy determine what is covered. As a result, you should read them carefully to understand the extent of coverage provided.
 

 [[Image here]]
 

 112When This Policy Provides Liability Protection
 

 [[Image here]]
 

 If an accident or incident happens that may involve liability protection provided in this policy, you or any other protected person involved must:
 

 [[Image here]]
 

 3. Send us a copy of all written demands. Also send us a copy of all legal documents if someone starts a lawsuit.
 

 4. Cooperate and assist us in securing and giving evidence, attending hearings and trials, and obtaining the attendance of witnesses.
 

 5. Not assume any financial obligation or pay out any money without our consent. ...
 

 PHYSICIANS’ PROFESSIONAL LIABILITY PROTECTION CLAIMS MADE
 

 How This Agreement Protects You
 

 This agreement provides protection against professional liability claims which might be brought against you in your practice as a physician or surgeon.
 

 [[Image here]]
 

 What this agreement covers
 

 Individual coverage. Your professional liability protection covers you for damages resulting from:
 

 1. Your providing or withholding of professional services.
 

 2. The providing or withholding of professional services by anyone whose acts you’re legally responsible for....
 

 [[Image here]]
 

 Additional benefits. Any of the following are in addition to the limits of your coverage.
 

 We’ll defend any suit brought against you for damages covered under this agreement. We’ll do this even if the suit is groundless or fraudulent. We have the right to investigate, negotiate and settle any suit or claim if we think that’s appropriate.
 
 (Emphasis supplied.)
 

 | isWe’ll pay all costs of defending a suit, including interest on that part of any judgment that doesn’t exceed the limit of your coverage. But we won’t defend a suit or pay any claim after the applicable limit of your coverage has been used up paying judgments [or] settlements.
 

 The case of
 
 Employers’ Surplus Lines Ins. Co. v. City of Baton Rouge,
 
 862 So.2d 561 (La.1978), involved the interpretation of a liability insurance policy that included a deductible endorsement providing that the deductible amount would be deducted from the total amount that the insured “shall become legally obligated to pay.” The insurer settled a lawsuit against the insured, and sought reimbursement of the amount of the deductible from the insured.
 
 *818
 
 Although the supreme court ultimately ruled that the insured’s consent to the settlement was relevant to the issue of whether the insured was “legally obligated to pay” the deductible portion of the settlement, the court noted that the policy language authorized the insurer to “make such investigation, negotiation and settlement of any claim or suit it deems expedient.” The court concluded that “[t]his provision vests the insurer with
 
 absolute authority to settle claims within the limits of the policy with the insured’s having no power
 
 to compel the insurer to make settlements or
 
 to prevent it from so doing.” Id.
 
 at 564. (Emphasis supplied.)
 

 A leading doctrinal authority has similarly described the prevailing rule in our state:
 

 Most liability policies do not impose any express obligation on the insurer with respect to settlement. Commonly, the insurer is given the discretionary right to “make such investigation and settlement of any claim or suit as it deems expedient.” This policy language gives the insured no voice in the settlement decision. The insured does not retain any authority to require or veto settlement. Exceptions to this broad grant of authority may be found in professional liability policies and in policies in which the insured is required to contribute to the settlement. The authority to approve settlements is often granted the insured in professional liability policies because of the belief that the professional should | ^participate in a deci-sión which may damage his professional reputation.
 

 15 William Shelby McKenzie & H. Alston Johnson III,
 
 Louisiana Civil Law Treatise: Insurance Law and Practice
 
 § 218 (3rd ed.2006) (footnotes omitted).
 
 [8]
 

 See also
 
 Lee R. Russ,
 
 et al.,
 
 14
 
 Couch on Insurance
 
 §§ 203:2, 203:8 (3rd ed.2008).
 

 The court in
 
 Davenport v. St. Paul Fire & Marine Ins. Co.,
 
 978 F.2d 927, 931 (5th Cir.1992), held that the typical policy provisions authorizing an insurer to settle claims or suits “are unambiguous and give the insurer the right to assume control of the defense of an action against the insured to the exclusion of the latter.” It further observed:
 

 The insurer’s right to control the defense is at its strongest where, as here, the potential liability is solely that of the insurer.
 
 Adequate coverage for the potential liability being conceded, control by the insurer is viriually absolute, since the insured, has no exposure whatever.
 

 Id.
 
 (Emphasis supplied.)
 
 [9]
 
 Addressing the situation where the insured opposes settlement in such circumstances, the court also noted:
 

 The issue of control sometimes arises in cases where the insurer settles within the policy limits a case that the insured, for some reason dehors the contract, does not want settled. The consensus of the courts that have considered this question is that,
 
 absent a policy rider to
 
 
 *819
 

 the contrary, such settlement is the exclusive prerogative of the earner.
 

 Id.
 
 at 932. (Emphasis supplied.)
 

 In
 
 Caplan v. Fellheimer Eichen Braverman & Kaskey,
 
 68 F.3d 828, 839 (3rd Cir.1995), the court, interpreting Pennsylvania law, held that under similar policy language, “the sole determination required of [the insurer] in 115settling a suit is that it thinks the settlement is appropriate,” and that absent a “consent to settle”, clause, the insurer “is not required by the policy to obtain the [insureds’] approval of any settlement.” The court also observed that “in their contract with [the insurer] for insurance coverage, [the insureds] authorized [the insurer] to act as their agent to settle claims or suits as [the insurer] thinks ‘appropriate.’ ”
 
 Id.
 
 at 835. In doing so, the court concluded the insureds “contracted with [the insurer] to authorize [it] to settle this litigation,” and in doing so “acted to permit the outcome which they find unacceptable.”
 
 Id.
 
 at 839.
 

 Because the underlying medical malpractice action was brought subject to the Louisiana Medical Malpractice Act, La. R.S. 40:1299.41,
 
 et seq.,
 
 its provisions are directly relevant to St. Paul’s duty and authority as Dr. Teague’s insurer, and indirectly relevant to the defendants’ respective duties to St. Paul and Dr. Teague. In particular, the following language of La. R.S. 40:1299.44(0(7) should be considered:
 

 For the benefit of both the insured and the patient’s compensation fund, the insurer of the health [care] provider shall exercise good faith and reasonable care both in evaluating the plaintiffs claim and in considering and acting upon settlement thereof. A self-insured health care provider shall, for the benefit of the patient’s compensation fund, also exercise good faith and reasonable care both in evaluating the plaintiffs claim and in considering and acting upon settlement thereof.
 

 We cannot interpret the foregoing language as impairing in any way St. Paul’s exclusive right to settle the medical malpractice claim if it concluded such compromise was appropriate. Similarly, we do not read it as establishing any additional duty on the part of St. Paul toward Dr. Teague other than those contractual duties already imposed upon it by law.
 
 See
 
 La. C.C. art.1983 and La. R.S. 22:1220. Rather, the obvious purpose of this provision was to create and clarify an extracontrac-tual statutory duty on the Impart of an insurer or a self-insured health care provider toward the PCF, as is evident from the second sentence.
 
 [10]
 

 It is well settled that 'the law favors compromise and voluntary settlement of disputes out of court with the attendant saving of time and expenses to both the litigants and the court.
 
 Honeycutt v. Town of Boyce,
 
 341 So.2d 327, 331 (La.1976). In other words, it has long been the public policy of this state that the compromise of disputes is highly favored and promotes judicial efficiency.
 
 Trainer v. Aycock Welding Co.,
 
 421 So.2d 416, 417
 
 *820
 
 (La.App. 1st Cir.1982). This policy underlies the affirmative statutory duty of a liability insurer to “make a reasonable effort to settle claims with ... the claimant.”
 
 See
 
 La. R.S. 22:1220(A).
 

 An insurer is not required to settle a claim within policy limits under penalty of absolute liability for any excess judgment rendered against the insured.
 
 Cousins v. State Farm Mut. Auto. Ins. Co.,
 
 294 So.2d 272, 275 (La.App. 1st Cir.),
 
 writ refused,
 
 296 So.2d 837 (La.1974). In other words, where a judgment in excess of policy limits is rendered against an insured, a mistake in judgment or settlement value should not of itself subject an insurer to liability beyond that of its policy limits.
 
 See Ins. Co. of N. America v. Home Ins. Co.,
 
 644 F.Supp. 359, 363 (E.D.La.1986). The same general principle should apply with even greater force where a mistaken estimate of judgment value or settlement value by an insurer with absolute authority to settle results in a settlement
 
 within the policy limits,
 
 with no |17monetary exposure to the insured resulting from the claim. As one Louisiana authority has aptly observed:
 

 Anyone involved in handling claims quickly learns that the evaluation of liability and amount of damages is not an exact science, and reasonable professional judgment may vary (substantially in larger claims) on where to draw the line in settlement negotiations.
 

 15 William Shelby McKenzie & H. Alston Johnson III,
 
 Louisiana Civil Law Treatise: Insurance Law and Practice
 
 § 218 (3rd ed.2006).
 

 Observing that a “consent to settle” clause is often a specifically negotiated term in malpractice policies, a New Jersey court declined to “reform” a malpractice policy to include such a clause in favor of the insured physician who was an omnibus insured under a hospital’s policy. In doing so, the court noted that the remedy sought was “counter to New Jersey’s public policy of encouraging the settlement of litigation.”
 
 Webb v. Witt,
 
 379 N.J.Super. 18, 33-4, 876 A.2d 858, 867 (N.J.App.2005). In that regard, the court explained:
 

 A veto power over settlements will impede rather than advance this public policy. Even where an insurer and claimant are prepared to settle, some cases will be tried to conclusion because the insured physician refuses to consent. This will cause unnecessary expenses to the parties and undue consumption of judicial time and resources. Lay and expert witnesses will have to testify in court under circumstances where a trial could have been avoided. More importantly, the result of such a trial may not be satisfactory to the claimant or the insurer.
 

 Id.,
 
 379 N.J.Super. at 34, 876 A.2d at 867.
 

 As the court in
 
 Hurvitz v. St. Paul Fire & Marine Ins. Co.,
 
 109 Cal.App.4th 918, 931-32, 135 Cal.Rptr.2d 703, 712-13 (Cal.App.2003), explained:
 

 The decision to settle rather than continue litigation invariably involves a conflict between the desire to vindicate oneself and the desire to minimize the costs of litigation and avoid the risk of loss.
 
 Defendants who settle face an uphill battle in
 
 |
 
 1Rconvincing others, including members of the interested public or the media, that they toere completely innocent of the
 
 charges....
 
 These are the ordinary consequences of settlement. A party purchasing a liability insurance policy containing the duty to defend language at issue here agrees to accept the insurer’s view concerning the point at ivhich the benefits of settlement exceed the risk of continuing litigation. The alternative is to negotiate
 
 — and
 
 pay for
 
 — a
 
 policy with a consent provision. Liability insurance exists pri-
 
 
 *821
 

 manly to protect the insured’s finances.
 
 The covenant of good faith and fair dealing requires the insurer to minimize the possibility of an award that exceeds the policy limits — it does not require the insurer to fight a legal action until the bitter end when the costs of defense exceed the benefit to be achieved. (Citations omitted; emphasis supplied.)
 

 In Shuster v. S. Broward Hosp. Dist. Physicians’ Liab. Ins. Trust,
 
 591 So.2d 174 (Fl.1992), a physician sued his malpractice liability insurer for settling three suits against him for amounts within the policy limits. He alleged that the insurer acted in bad faith by failing to fully investigate the claims and settling for unreasonably excessive sums, despite his request that it deny any liability and defend the suits. The physician claimed damages for the inability to maintain malpractice coverage, lost income, damage to his reputation, and mental and emotional stress. The policy contained the standard provision allowing the insurer to “make such investigation and such settlement of any claim or suit as it deems expedient.” The Florida supreme court observed that the provision “surrenders all control over the handling of the claim to the insurer,” and that its “obvious intent ... was to grant the insurer the authority to decide whether to settle or defend the claim based on its own self-interest, ... regardless of whether the claim is frivolous or not.”
 
 Id.
 
 at 176-77. The court further explicitly recognized that the insurer had the right to settle a claim within the policy limits “without considering the impact of higher premiums or damage to the insured’s reputation.”
 
 Id.
 
 at 177. The court therefore held that in cases involving such a policy provision, “a cause of action for breach of a good faith duty owing to the |^insured will not lie for failure to defend or investigate a claim when the insurer has settled the claim for an amount within the limits of the insurance policy.”
 
 Id.
 
 at 178.
 

 The Attorney’s Standard of Care and Cause-in-Fact
 

 The standard of care that an attorney must exercise in the representation of a client is that degree of care, skill, and diligence that is exercised by prudent practicing attorneys in his locality.
 
 Ramp v. St., Paul Fire & Marine Ins. Co.,
 
 263 La. 774, 786, 269 So.2d 239, 244 (La.1972);
 
 Frisard v. State Farm Fire & Cas. Co.,
 
 06-2353, pp. 5-6 (La.App. 1st Cir.11/2/07), 979 So.2d 494, 497. A claim for legal malpractice is stated when the plaintiff alleges that there was an attorney-client relationship, the attorney was guilty of negligence or professional impropriety in his relationship with the client, and the attorney’s misconduct caused the client some loss.
 
 Prestage v. Clark,
 
 97-0524, p. 9 (La.App. 1st Cir.12/28/98), 723 So.2d 1086, 1091,
 
 writ denied,
 
 99-0234 (La.3/26/99), 739 So.2d 800. The proper method of determining whether an attorney’s malpractice is a cause-in-fact of damage to his client is whether the performance of that act would have prevented the damage.
 
 Id.
 
 Thus, simply establishing that an attorney was negligent, whether based upon the failure to conform to an ethical rule or some other standard, would not be sufficient to state a cause of action for legal malpractice.
 
 See Executive Recruitment, Inc. v. Guste, Barnett & Shushan,
 
 533 So.2d 129, 131 (La.App. 4th Cir.1988),
 
 writ denied,
 
 535 So.2d 742 (La.1989).
 

 In its opinion in this matter, the supreme court stated that “the failure by Dr. Teague’s attorneys to post the jury bond” was “[t]he underlying |20action of [legal] malpractice that precipitated the settlement,”
 
 [11]
 
 and that “the loss of the jury trial
 
 *822
 
 ... led to the mediation and settlement of [the] case.”
 
 [12]
 
 The settlement of the medical malpractice action, however, and St. Paul’s consequent reporting of the settlement to the Data Bank are the supposed injurious events upon which Dr. Teague’s entire claim for damages is founded. Yet the supreme court also concluded that “the actions of mediating and settling the case were not negligent acts in and of themselves,” and that “[b]oth St. Paul and the defendants were well within their contractual rights in effecting the mediation and subsequent settlement without [Dr. Teag-ue’s] consent.”
 
 [13]
 

 Dr. Teague interprets the supreme court’s decision as dispositive of all issues relating to the defendants’ liability to him for malpractice, in practical effect leaving only the issue of the amount of damages for our determination.
 
 [14]
 
 We must disagree. The same opinion clearly states that the supreme court “granted this writ to determine whether plaintiffs action was |2iperempted,”
 
 [15]
 
 and that its intent in doing so was “to addi*ess
 
 only
 
 the issue of peremption.”
 
 [16]
 
 (Emphasis supplied.) The court’s extended discussion relating to whether the defendant attorneys’ negligence or ethical omissions could form the basis for a claim for legal malpractice is clearly limited to the issue of peremption only, and is otherwise
 
 dicta,
 
 as expressed in the dissenting opinion and implied in the concurring opinion.
 

 In effect, Dr. Teague seems to contend that the defendants’ negligent failure to post the jury bond timely and violation of the ethical duty to keep him informed of the status of settlement efforts amount to legal malpractice
 
 per se,
 
 or a form of “strict liability,” entitling him to general damages. Acceptance of that argument would require the substantial revision, if not abrogation, of the standard of care articulated in
 
 Ramp, supra.
 
 That well-recognized standard of care is consistent with and obviously derives from the general codal articles upon which delictual liability for negligence is founded.
 
 See
 
 La. C.C. arts. 2315(A) and 2316.
 
 [17]
 

 In
 
 Saucier v. Hayes Dairy Products, Inc.,
 
 373 So.2d 102 (La.1979), the supreme court recognized that its authority con
 
 *823
 
 ferred by the Louisiana Constitution to regulate the practice of law “stems from the grant of original exclusive jurisdiction of disciplinary proceedings against a member of the bar.” However, it went further to proclaim that because the disciplinary rules had “the force and effect of substantive law,” those rules “override legislative acts which tend to impede or frustrate that authority; only 122legislative enactments in this area which aid the Court’s inherent powers will be approved.”
 
 Id.
 
 at 115.
 

 In 1991, the legislature enacted La. R.S. 6:1351-54, addressing the professional responsibilities and standards of care for attorneys and certified public accountants providing services to federally insured financial institutions. While not directly applicable to the factual situation before us, the statutes convey an unequivocal expression of legislative intent on the application of the Rules of Professional Conduct in defining legal malpractice for purposes of imposition of civil liability. Louisiana Revised Statutes 6:1351 initially provides that “attorneys licensed to practice law in this state and their law firms[,] ... while acting in the course and scope of providing legal ... services to federally insured financial institutions, shall have no greater duty of professional responsibility to the institution ... than that required under attorneys under the Rules of Professional Conduct[.]” More importantly, however, La. R.S. 6:1352 further provides:
 

 A. An attorney ... providing legal ... services to a federally insured financial institution shall only be liable for actions or inactions based upon traditional concepts of legal ... malpractice judged under accepted standards within the locality where such attorney ... practices. B. The Rules of Professional Conduct for attorneys ... shall not be viewed as formulated malpractice rules and failure to comply with the requirements of those rules shall not be considered malpractice per se.
 

 The foregoing language plainly was intended to embody the standard of care articulated in
 
 Ramp.
 
 One commentator previously observed that La. R.S. 6:1352 “may put to an end, at least in Louisiana, the movement to make the [Rules of Professional Conduct] malpractice standards.” Warren L. | gjMengis,
 
 Professional Responsibility, Developments in the Law 1990-1991: A Faculty Symposium,
 
 52 La. L.Rev. 721, 727 (1992).
 
 [18]
 

 Concerning the interplay between the standard of care for attorneys in legal malpractice cases and the ethical rules, another leading doctrinal authority has stated the following:
 

 One vexing issue is the extent to which ethical or professional rules should be relevant or determinative in an attorney malpractice action. That is, should a violation of the Rules of Professional Conduct be treated like a violation of statute in a negligence case, i.e., as negligence per se? The better rule would seem to be that the ethics rules are relevant to, but do not determine, the standard of care.
 

 21 Frank L. Maraist,
 
 et al., Louisiana Civil Law Treatise: Louisiana Lawyering
 
 § 18.4 (2007), We agree with that conclusion.
 

 
 *824
 
 In the case of
 
 Reed v. Verwoerdt,
 
 490 So.2d 421 (La.App. 5th Cir.1986), two attorneys sued a client for legal fees related to a tort suit and domestic litigation. The client reconvened, asserting claims for defamation, abuse of process, and legal malpractice. The legal malpractice claim was based upon the client’s contention that they charged her an excessive contingent fee, and failed to inform her of the present value of a structured settlement. After determining that the amount of the fee was not excessive, the court was confronted with the issue of whether the attorneys’ alleged violation of the former Code of Professional Responsibility relating to keeping a client informed constituted malpractice
 
 per se.
 
 Rejecting the client’s argument, the court observed, citing
 
 Ramp,
 
 that “[tjhus far ... the Louisiana Supreme Court has not viewed the Code of Professional Responsibility as formulated malpractice rules.”
 
 Id.
 
 at 427. It therefore held | that “the failure of the [attorneys] to inform [the client] of the present value of her settlement insofar as negotiating their contingent fee does not constitute malpractice
 
 per se.” Id.
 
 at 428.
 
 See also Hudspeth v. Smith,
 
 42,647, p. 9 (La.App. 2nd Cir.11/7/07), 969 So.2d 793, 798 (An attorney’s failure to return a
 
 former
 
 client’s case file, standing alone, did not equate to legal malpractice, where the former client failed to show any loss attributable to such failure).
 

 More recently, however, another Louisiana court of appeal has found the Rules of Professional Conduct to be “instructive” in determining if an attorney had a duty to render an accounting of funds in his possession to a client whose status as such was disputed.
 
 Smith v. Patout,
 
 06-950, p. 4 (La.App. 3rd Cir.4/11/07), 956 So.2d 689, 692. After determining that the person was in fact a client, the court observed that by the terms of Rule 1.15(d), the attorney had a professional duty to render an accounting to that client upon request, even if he would have been a third person and nonclient. Citing
 
 Succession of Wallace,
 
 574 So.2d 348 (La.1991), the court observed that “[t]he Rules of Professional Conduct have the force and effect of substantive law.”
 
 Id.,
 
 06-950 at p. 5, 956 So.2d at 692. One judge, concurring and dissenting in part, went further in expressing her opinion that “[t]he Rules of Professional Conduct establish the standard of care required of an attorney” and that “[a] breach of the fiduciary duty established under the Rules gives rise to a claim in tort.”
 
 Id.,
 
 06-950, 956 So.2d at 694. That writer concluded: “It would be absurd to conclude a court has no legal authority to award damages to a client for a [sic] ethical violation of the Rules.”
 
 Id.
 

 The Rules of Professional Conduct establish minimum standards for the ethical conduct of attorneys not only in their relations with their own|gsclients, but with adversaries, opposing attorneys, the public, and the courts. Yet it cannot be seriously contended that the breach of an ethical duty to a client’s adversary, absent malice, creates an actionable duty enforceable in tort.
 
 See Montalvo v. Sondes,
 
 93-2813, pp. 3-4 (La.5/23/94), 637 So.2d 127, 130, and
 
 Penalber v. Blount,
 
 550 So.2d 577, 581 (La.1989). Similarly, it is plain that an attorney’s breach of a rule imposing a duty relating to the general public would not, absent very unusual circumstances, vest a non-client with a delictual cause of action against an attorney.
 
 See Spencer v. Burglass,
 
 337 So.2d 596 (La.App. 4th Cir.1976),
 
 writ denied,
 
 340 So.2d 990 (La.1977).
 

 In short, despite the broad pronouncements of judicial authoritjr in
 
 Saucier
 
 and
 
 Succession of Wallace,
 
 our supreme court has never definitively stated that the Rules of Professional Conduct constitute
 
 *825
 
 the legal standard of care upon which del-ictual causes of action for professional legal negligence are founded. We conclude that the respective roles of the positive law enacted by the legislature and the Rules of Professional Conduct in determining the legal standard of care for attorneys may properly be reconciled. Only where the two intersect and actually conflict on a matter peculiarly related to regulation of the practice of law and the attorney-client relationship, such as the reasonableness of fees charged, do the judicially-created ethical rules trump the will of the legislature. In other civil matters addressing the legal existence of lights and causes of action between attorneys and clients or third persons, their scope, and their requisite elements, the legislative will should govern.
 

 However, even in the latter cases, the Rules of Professional Conduct will usually be relevant in defining the legal standard of care, which may vary depending upon the particular circumstances of the relationship. For | ^example, our courts have recognized that the extent of an attorney’s duty to a client may depend in part on the client’s particular circumstances and situation.
 
 Prestage,
 
 97-0524 at p. 9, 723 So.2d at 1091.
 
 [19]
 
 The relevance of such subjective considerations in determining liability for legal malpractice weighs against interpretation of the Rules of Professional Conduct as a basis for imposition of liability
 
 per se.
 

 We therefore conclude that although the Rules of Professional Conduct may be relevant in defining the particular standard of care imposed upon attorneys in most circumstances, they do not provide an independent basis upon which to impose liability upon an attorney for legal malpractice.
 
 [20]
 
 Thus, proof of the violation of an ethical rule by an attorney, standing alone, does not constitute
 
 actionable
 
 legal malpractice
 
 per se.
 

 Rule 1.4 forms part of Article 16, Rules of Professional Conduct, in the articles of incorporation of the Louisiana State Bar Association. It provides, in pertinent part:
 

 (a) A lawyer shall:
 

 (1) promptly inform the client of any decision or circumstance with respect to which the client’s informed consent, as defined in Rule 1.0(e), is required by these Rules;
 

 | m(2) reasonably consult with the client about the means by which the client’s objectives are to be accomplished;
 

 (3) keep the client reasonably informed about the status of the matter;
 

 
 *826
 
 (4) promptly comply with reasonable requests for information; ...
 

 [[Image here]]
 

 (b) The lawyer shall give the client sufficient information to participate intelligently in decisions concerning the objectives of the representation and the means by which they are to be pursued.
 

 Rule 1.0(e), referenced above, defines “informed consent” as follows:
 

 (e) “Informed consent” denotes the agreement by a person to a proposed course of conduct after the lawyer had communicated adequate information and explanation about the material risks of and reasonably available alternatives to the proposed course of conduct.
 

 Rule 1.2 further provides, in pertinent part:
 

 (a) Subject to the provisions of Rule 1.16 and to paragraphs (c) and (d) of this Rule, a lawyer shall abide by a client’s decisions concerning the objectives of representation, and, as required by Rule 1.4, shall consult with the client as to the means by which they are to be pursued, A lawyer may take such action on behalf of the client as is impliedly authorized to carry out the representation. A lawyer shall abide by the client’s decision whether to settle a matter....
 

 In the case of
 
 Jenkins v. St. Paul Fire & Marine Ins. Co.,
 
 422 So.2d 1109 (La.1982), our supreme court modified the former “case within a case” evidentiary burden of proof in legal malpractice cases. The “case within a case” approach, as its name implied, required a plaintiff in a legal malpractice case to not only prove his former attorney’s negligence in handling the underlying legal matter, but also that the underlying claim or litigation would have been successful but for the attorney’s negligence.
 
 Id.
 
 at 1109-10. The supreme court summarized its holding as follows:
 

 [Wjhen the plaintiff (as in this case) proves that negligence on the part of his former attorney has caused the loss 12sof the opportunity to assert a claim and thus establishes the inference of damages resulting from the lost opportunity for recovery, an appellate court (viewing the evidence on the merits of the original claim in the light most favorable to the prevailing party in the trial court) must determine whether the negligent attorney met his burden of producing sufficient proof to overcome plaintiffs prima facie case.
 

 Id.
 
 1110.
 

 Does the
 
 Jenkins
 
 rule apply in the context of the present action, where the plaintiff, an insured, is claiming the loss of an opportunity to
 
 defend
 
 a monetary claim, the immediate cause of such lost opportunity being the independent decision of the plaintiffs insurer to settle the adverse claim within its policy’s monetary liability limits? We conclude it does not.
 

 In
 
 Rawboe Properties, L.L.C. v. Dorsey,
 
 06-0070 (La.App. 4th Cir.3/21/07), 955 So.2d 177,
 
 writ denied,
 
 07-0763 (La.6/1/07), 957 So.2d 178, former clients of attorneys sued them for legal malpractice, claiming that the attorneys failed to file a supplemental fire loss claim within the deadline specified by the clients’ insurance policy. The trial court agreed that the plaintiff clients successfully proved that the defendant attorney committed malpractice, but determined that they did not prove that they sustained any damages as a result of his malpractice. On appeal, the plaintiff clients argued that the trial court erred by not applying the
 
 Jenkins
 
 rule to establish a presumption that they sustained some loss. The appellate court rejected their argument, stating that the mere proof of an attorney’s failure to timely assert a claim “does not automatically translate to a loss for which a party could have recov
 
 *827
 
 ered monetary damages.”
 
 Id.,
 
 06-0070 at pp. 9-10, 955 So.2d at 182-83.
 

 In the present case, we conclude that the mere failure of the defendants to timely post the jury bond, or to notify Dr. Teague of the mediation, given all the circumstances, did not establish a
 
 prima fa-cie
 
 case 12t)Of “some loss” on the part of Dr. Teague (as opposed to St. Paul) applicable to the monetary claim being defended. Thus, Dr. Teague at all times retained the burden of proof that he in fact sustained damages caused by the defendants’ omissions, and the nature and extent of his claimed damages.
 

 Factual and Expert Testimony at Trial
 

 Michael A. Teague, M.D.
 

 Dr. Teague testified that when Mr. Zu-ber initially contacted him regarding the medical malpractice claim, Mr. Zuber expressed the opinion that the claim lacked merit and would probably “go away.” He explained that he and Mr. Zuber had “worked together” on earlier cases, and that based upon past experience, he expected his attorneys to keep him fully apprised of the status of the claim. Dr. Teague testified that he was never advised of Ms. Nobile’s assumption of primary responsibility in defending the claim. He further confirmed that he was never advised of any changes in the claim evaluation or assessment, the request to mediate the claim, the scheduling of the mediation, or the settlement until after the settlement.
 

 Dr. Teague also confirmed that he was not in his office on October 17, 1994, the date upon which Ms. Brown claimed she last met with him prior to the surgery and upon which one consent form was updated. He explained that he was in surgery and had a personal dentist’s appointment in the afternoon, and that Ms. Brown would have actually met with his nurse-counselor regarding the consent form. Dr. Teague testified that the nurse-counselor never advised him of any objection or withdrawal of consent by Ms. Brown to the forehead lift procedure.
 

 Dr. Teague described himself as confused when he first received notice of Ms. Nobile’s telephone message that the medical malpractice claim was settled. He called Ms. Nobile back and confirmed the settlement had |3ntaken place, and was advised that one of the reasons prompting the decision to settle was the trial judge’s status as trier of fact. He later telephoned Mr. Zuber to discuss what had occurred, by which time he was very upset. Dr. Teague emphasized that he never advised either Mr. Zuber or Ms. Nobile that he wanted the claim against him settled, and in fact did not want it settled. Up to that point, he explained, he had never had a medical malpractice claim against him resolved by settlement or judgment against him. Although he admitted being advised by Ms. Nobile that the trial judge’s role as trier of fact was a factor in the settlement, Dr. Teague denied ever being informed by either Ms. Nobile or Mr. Zuber that they failed to timely file the jury bond, and asserted that he only learned of that fact after hiring another attorney to correct an inaccuracy in the report to the Data Bank.
 

 With regard to his damages, Dr. Teague described his loss as “loss of reputation.” He explained that after learning of the settlement, his “main thrust” was to correct the error in the report sent by St. Paul to the Data Bank, in which the nature of the claim was described as operating on the wrong body part. During the course of that attorney’s investigation, Dr. Teague was advised that the defendants had made certain errors in the handling of his defense.
 

 
 *828
 
 Under cross-examination, Dr. Teague admitted that he never told the defendants that he wanted a jury as trier of fact for the medical malpractice claim. But he contended that his opportunity to deny his negligence before a jury and to “present [his] case” was “taken away” from him by the fact of settlement.
 

 | 31 Catherine Nobile
 

 Called as an adverse witness by Dr. Teague, Ms. Nobile acknowledged that she, Mr. Zuber, and their law firm represented Dr. Teague and his partnership as the defendants in the medical malpractice action. She further acknowledged that on behalf of those defendants, a jury trial was requested, but explained that neither of those clients directly requested such action. She admitted that the required jury bond was not filed within the deadline imposed by the trial court, thereby resulting in the loss of the right to jury trial. Ms. Nobile further admitted that although she notified St. Paul of the failure to timely file the jury bond, she did not notify Dr. Teague. She explained, however, that there was no right to a jury trial in a medical malpractice case if the cause of action did not exceed $50,000.00.
 

 Ms. Nobile admitted that she never personally met with Dr. Teague and never spoke to him regarding Ms. Brown’s claim that she met with him the day prior to the surgery regarding the issue of the forehead lift. She also admitted that she only learned after the settlement that Dr. Teag-ue was out of his office that day in surgery and due to a personal dentist’s appointment. She conceded that it would have been “good legal practice” to have discussed the foregoing issue with Dr. Teag-ue. Ms. Nobile also admitted that she never discussed the possibility of settlement or any settlement recommendation to St. Paul with Dr. Teague, nor did she advise him of the scheduled mediation before it took place.
 

 Ms. Nobile maintained the position that both St. Paul and Dr. Teague were her clients, even if St. Paul was not a named party defendant. She explained that St. Paul rather than Dr. Teague had the authority to settle the medical malpractice case, and that she never considered those clients’ interests to be in conflict regarding settlement. She conceded that, in |S2hindsight, she should have kept Dr. Teague better informed, and in that event, if he had objected to the proposed settlement, she would have withdrawn from representation of either St. Paul or, more likely, both clients.
 

 Ms. Nobile was questioned at length about the contention that the consent form for the forehead lift was updated, or the date altered, from October 11, 1994 to October 17,1994. She conceded a mistake in that regard, in that separate consent forms, for the lower eyelid blepharoplasty and the forehead lift, were both signed by Ms. Brown on October 11,1994, and that it was actually the consent form for the lower eyelid blepharoplasty that was updated on October 17,1994.
 

 Donald S. Zuber
 

 Dr. Teague also called Mr. Zuber as an adverse witness. Mr. Zuber testified that he was a partner in his law firm, a limited liability partnership, during the course of the medical malpractice action. He confirmed that he signed and filed an answer to the petition on behalf of Dr. Teague, and that a request for trial by jury was made in the answer. He explained, however, that the decision to request a jury trial was made by St. Paul, not by Dr. Teague. Upon being advised by Ms. No-bile of her failure to timely file the required jury bond, Mr. Zuber advised her to notify St. Paul, but did not specifically instruct her to notify Dr. Teague. Mr.
 
 *829
 
 Zuber acknowledged that Ms. Nobile attempted to obtain a new case management schedule from the trial court, probably in order to obtain a revised jury bond filing deadline, but that Ms. Brown’s attorney objected to any such revision. Mr. Zuber further acknowledged that Dr. Teague was not advised of those developments.
 

 IssWhile Mr. Zuber admitted that Ms. Nobile scheduled and participated in the mediation without notifying Dr. Teague, he emphasized the “tripartite relationship” of insurer, insured, and attorney, and explained that under that arrangement, Dr. Teague had contractually assigned his right to consent to settlement to St. Paul. He disagreed with the suggestion that the defense attorneys settled the case, insisting that St. Paul, through its claims adjuster, Ms. Laufer, made the decision to settle. He conceded that his law firm should have kept Dr. Teague better informed, emphasizing that he had never disputed that point throughout the course of the present litigation.
 

 On direct examination, Mr. Zuber described receiving a telephone call from Dr. Teague on November 1, 1999, the Monday after the mediation and settlement. Dr. Teague was aware of the fact that the settlement would be reported to the Data Bank, and was “extremely angry,” “furious,” and “very upset.” At the time Mr. Zuber received the call, he was unaware of the settlement. Mr. Zuber testified that Dr. Teague specifically stated that he did not care whether the case would have been tried to a judge or jury, and that he would have been “perfectly happy” to try the case before Judge Clark as trier of fact.
 

 Mr. Zuber testified that in the course of his legal career he defended hundreds of medical malpractice cases, including probably 400 to 500 such cases on behalf of St. Paul. He explained that it was not unusual for the evaluation of the merits of a case to change as it progresses, and that many factors are taken into consideration in evaluation.
 

 Herbert Mang, Jr.
 

 Herbert Mang, Jr., an attorney whose practice is limited to medical malpractice defense, testified on behalf of Dr. Teague as a legal expert witness in the field of medical malpractice. Mr. Mang initially explained |?4that a “consent to settle” clause is a provision contained in some medical malpractice policies that requires the insurer to obtain the insured physician’s permission, usually in writing, to settle a case brought against the physician. He testified that the existence of such a clause, however, had no bearing upon an attorney’s professional obligation to keep his physician client reasonably informed.
 

 Mr. Mang testified that he had reviewed parts of the file relating to Dr. Teague’s defense. He agreed with the proposition that the trial judge in Dr. Teague’s case had the reputation among attorneys of being “somewhat plaintiff-oriented.” He expressed the opinion that if an attorney misses a meaningful deadline, such as the deadline to post a jury bond, and if the case is thereby “put in a worse posture,” that omission would be below the professional standard of care applicable to the attorney’s conduct. He also expressed his opinion that the loss of the right to trial by jury in Dr. Teague’s case had an adverse effect upon the manner in which the case was thereafter defended. Mr. Mang further stated that a mediation is an important event about which the physician client should be informed. Mr. Mang also emphasized the importance of detailed consultation with a physician client in understanding the medical issues relevant to the defense, and explained that ongoing communication on the case’s status was part of that aspect of maintaining an effective defense. He also explained the conse
 
 *830
 
 quences of settlement from a physician’s standpoint, including the requirement of a report to the Data Bank, possible removal from “managed care” plans, and possible effect on hospital staff privileges.
 

 Referencing a hypothetical situation in which an insurer may wish to settle, Mr. Mang explained that disagreement between an insurer and insured as to settlement could give rise to a conflict of interest on the part of a | ^defense attorney, in which event he would advise the assignment of separate counsel for each client. He also stated his opinion that settling a medical malpractice case without previously notifying a physician client of the proposed settlement fell below the applicable standard of care for a defense attorney. He similarly expressed the opinion that keeping the insurer informed of the case progress, while concealing some information from the insured, would fall below the professional legal standard of care.
 

 On cross-examination, Mr. Mang acknowledged that he was aware that St. Paul had been advised by Ms. Nobile that Dr. Teague felt strongly that Ms. Brown’s claim had no merit. He conceded that the medical malpractice insurer whom he exclusively represented from 1991 through 2004 issued policies that all contained “consent to settle” clauses, and that he only participated in perhaps three mediations on behalf of that insurer client. He admitted that the opinions he expressed regarding the potential conflict of interest as to clients opposed on the issue of settlement involved an insurer with a “consent to settle” clause in its policy, and conceded that without such a policy clause the defense attorney’s position would be “slightly different.” He admitted that Mr. Zuber’s transfer of primary responsibility for the defense of Dr. Teague to Ms. Nobile, without notifying Dr. Teague, did not as a practical matter amount to legal malpractice, although Dr. Teague should have been notified. Finally, Mr. Mang admitted that he had no knowledge that Dr. Teague in fact lost any hospital privileges or had any problems with licensing authorities or any board of medical examiners as the result of the settlement at issue.
 

 Doug Williams
 

 Doug Williams, an attorney whose practice is devoted to casualty defense, testified as an expert legal witness in medical malpractice defense 13ñon behalf of the defendants. Mr. Williams testified that about two-thirds of his practice was devoted to medical malpractice defense, and that he has represented insurers having “consent to settle” clauses in their policies and other insurers whose policies do not include such clauses. He explained that in cases arising under either type of policy, the attorney does not make the decision regarding settlement, and that ultimately the insurer funding the settlement makes that determination. Where a “consent to settle” clause exists, the insurer and the insured physician consult with each other as to the decision to settle or not, without the attorney’s intervention, according to Mr. Williams. He explained the attorney’s role in the “tripartite relationship” as a “limited engagement” to “defend that litigation,” and that where no “consent to settle” clause exists, the insurer controls the decision to settle or not.
 

 Mr. Williams testified that he had reviewed the file relating to the defense of the medical malpractice case, and that in his opinion “[i]t absolutely was reasonable to settle [that] case.” After explaining the uncertainties inherent in attempting to predict a lawsuit’s outcome, Mr. Williams expressed his opinion there were several factors present in the medical malpractice case supportive of a decision to attempt settlement. Among those factors were the second opinion obtained by Ms. Brown,
 
 *831
 
 raising question as to the necessity of the forehead lift versus the upper blepharo-plasty; Dr. Teague’s failure to obtain the insurer’s prior approval of the forehead lift versus approval of the upper blepharo-plasty; and the failure to update the forehead lift consent form at the same time that the lower blepharoplasty consent form was updated.
 

 Mr. Williams agreed that the failure to timely file a jury bond after requesting trial by jury is below the standard of professional care for an |37attorney. He testified, however, based upon his own experience, that the trial judge in Dr. Teague’s medical malpractice case was very “proactive” in “pushing” or encouraging settlement on the opening day of a jury trial, in effect acting as a mediator prior to the commencement of trial. He further explained that because jury trial is not available in cases where the damages sought are $50,000.00 or less, a stipulation by the plaintiff that a case involves $50,000.00 or less may result in a jury trial request being stricken, even on the eve of trial. Based upon his review of the facts of the medical malpractice case and his experience, Mr. Williams expressed the opinion that the defendants’ failure to file the jury bond had no effect upon the settlement for $50,000.00, as a stipulation as to the jurisdictional amount ($50,000.00) for jury trial would have had the same “end result.”
 

 On cross-examination, Mr. Williams conceded that an attorney defending a physician in a medical malpractice case has the duty to appropriately investigate the facts of the case and the duty to notify the physician of significant issues in the development of the case in which the physician has a role. He “absolutely disagree[d]” with the proposition that the failure to notify Dr. Teague of the failure to timely post the jury bond was a breach of the standard of care, and also disagreed that there was anything suggesting that the defendants intended to deceive or mislead Dr. Teague. Athough he agreed that the loss of the right to a jury trial may have been a factor in the decision to settle, he summarized his opinion by stating that even if the bond had been filed, “more probably than not in this case there would have been a stipulation [of case value of $50,000 or less] prior to trial because [Ms. Brown’s] counsel was willing to settle the case at $50,000 or less.” He further disagreed with Mr. Mang that it was a violation of the standard of care for the defendants not to notify Dr. Teague prior to bathe settlement. Rather, he characterized such an omission under these circumstances, where the insurer had the exclusive right to settle, as a breach of professional courtesy to the insured client.
 

 Dual Representation by Insurance Defense Counsel
 

 It has been observed that “[n]o specialty within the law is more singularly or directly affected by conflicts of interest problems than insurance defense.” Karon O. Bowdre,
 
 Conflicts of Interest Between Insurer and Insured: Ethical Traps for the Unsuspecting Defense Counsel,
 
 17 Am. J. Trial Advoc. 101 (1993). As to potential conflicts between a liability insurer and an insured relating to settlement, one court has aptly observed that “the ethical dilemma thus imposed upon the carrier-employed defense attorney would tax Socrates.”
 
 Hartford Accident & Indem. Co. v. Foster,
 
 528 So.2d 255, 273 (Miss.1988). The determination of the issues presented in this appeal may have profound implications not only upon the practice of insurance defense counsel, but potentially upon that of all attorneys.
 

 In its opinion in this matter, the supreme court noted that “[i]t is undisputed that an attorney-client relationship
 
 *832
 
 existed between Dr. Teague and the defendants.”
 
 Teague,
 
 07-1384 at p. 8, 974 So.2d at 1272. It did not discuss in comparable detail, however, the concurrent attorney-client relationship between St. Paul and the defendants, and the defendants’ duties toward St. Paul in accomplishing the compromise it chose to make. The mere fact that St. Paul was not an actual named defendant in the underlying medical malpractice action is irrelevant to the existence of its relationship with the defendants. In the context of liability insurance defense, the insured and the insurer are both clients.
 
 Foster,
 
 528 So.2d at 270. Between the attorney and the insurer who retained the attorney and paid for the defense, there exists a separate attorney-client relationship.
 
 American Mut. Liab. Ins. Co. v. Superior Court,
 
 38 Cal.App.3d 579, 591-2, 113 Cal.Rptr. 561 (1974). Thus, the insurer is entitled to expect counsel to fulfill the duty he has undertaken to the insurer.
 
 See State Farm Mut. Auto. Ins. Co. v. Federal Ins. Co.,
 
 72 Cal.App.4th 1422, 1429, 86 Cal.Rptr.2d 20, 24 (1999). The Mississippi Supreme Court in
 
 Foster, supra,
 
 expressly refused “[t]o make it the ethical duty of [the insurance defense attorney] to ignore his obligation to the carrier,” observing that “[i]t is just as repugnant ethically to ask [the insurance defense attorney] to ignore the interest of his insurance carrier client as it would be the other way around.” 528 So.2d at 272.
 

 In addition to keeping Dr. Teague reasonably informed of the progress of the litigation, including the proposed mediation and possible settlement, it would likely have been ethically incumbent upon the defendants to withdraw from representation of both Dr. Teague and St. Paul, under Rule 1.16 of the Rules of Professional Conduct, if informed of his opposition to settlement and to their continued representation of him toward that end. Nevertheless, those omissions alone are not dis-positive of the issues bearing upon the defendants’ alleged liability to Dr. Teague. Foremost among those issues is that of legal causation.
 

 Legal Causation
 

 The element of legal causation, in addition to causation in fact, must also be proven. Its importance in a legal malpractice action has been emphasized as follows:
 

 As in any tort claim, the plaintiff in a malpractice claim must establish that the attorney’s breach was not only the factual cause but also the legal cause of any injury. Legal or proximate cause, or scope of duty, normally does not present a significant or serious problem in a legal malpractice case. However, the issue does arise.... In sum, the legal cause issue, like so many duty/risk or legal cause issues under Louisiana tort |4nlaw, is an important one that should not be ignored. However it may provide practical and intellectual challenges to the client, lawyer, judge, and jury.
 

 21 Frank L. Maraist,
 
 et al., Louisiana Civil Law Treatise: Louisiana Lawyering
 
 § 18.5(2007).
 

 In our earlier opinion in this matter, we referenced the cases of
 
 Rogers v. Robson, Masters, Ryan, Brumund & Belom,
 
 74 Ill.App.3d 467, 30 Ill.Dec. 320, 392 N.E.2d 1365 (1979),
 
 affirmed,
 
 81 Ill.2d 201, 40 Ill.Dec. 816, 407 N.E.2d 47 (1980), and
 
 Mitchum v. Hudgens,
 
 533 So.2d 194 (Ala.1988), as representative of the conflicting positions taken by the courts of other jurisdictions on this pivotal issue and the significance of the absence of a “consent to settle” clause. Although the supreme court discussed the
 
 Rogers
 
 case in its opinion, it did not discuss the
 
 Mitchum
 
 case, which stands for the opposite conclusion. We attach no significance to that omission, as its discussion was not determinative of
 
 *833
 
 the issue and therefore must be considered
 
 dictum.
 
 The issue was instead remanded for our independent determination on the merit s; thus, we will again review both sides of the issue.
 

 In
 
 Rogers, supra,
 
 an Illinois appellate court reversed a summary judgment in a legal malpractice action brought by a physician against his former defense attorneys appointed to defend him in a medical malpractice action. The sole basis of the summary judgment was the fact that the medical malpractice policy provided that the insurer did not require the consent of a former insured to settle a claim brought under a prior policy covering the former insured. The physician advised the defense attorneys that he objected to any settlement. The defense attorneys negotiated settlement without informing the physician. The appellate court held that the defense attorneys breached a duty that,
 
 “if damages and proximate cause \,n[were] established,”
 
 would render them liable to the physician for damages.
 
 Rogers,
 
 74 Ill.App.3d at 475, 30 Ill.Dec. at 327, 392 N.E.2d at 1372. (Emphasis supplied.)
 

 The Illinois Supreme Court affirmed the appellate court’s reversal of the summary judgment.
 
 Rogers,
 
 81 Ill.2d 201, 40 Ill.Dec. 816, 407 N.E.2d 47 (1980). In doing so, however, the Illinois Supreme Court pointedly observed:
 

 [We need not] reach the question whether plaintiff could prove damages which are the
 
 proximate result of the breach of the duty
 
 to make a full disclosure of the conflict between defendants’ two clients. It cannot be determined from this record
 
 what damages, if any,
 
 plaintiff can prove. We decide only that this record does not preclude the possibility that some damage to plaintiff may have flowed from defendants’ alleged failure to make the requisite disclosure.
 

 Id.,
 
 81 Ill.2d at 205-6, 40 Ill.Dec. at 818, 407 N.E.2d at 49. (Emphasis supplied.)
 

 Significantly, the
 
 Rogers
 
 decision has since been distinguished and clarified, if not limited, by other Illinois courts. In
 
 Nagy v. Beckley,
 
 218 Ill.App.3d 875, 881, 161 Ill.Dec. 488, 491, 578 N.E.2d 1134, 1137 (1991), the court noted that although the
 
 Rogers
 
 decision was affirmed by the Illinois Supreme Court, the latter court significantly made no reference to any ethical rule in its opinion. The court in
 
 Nagy
 
 pointedly observed that despite the language used in
 
 Rogers,
 
 the prevailing weight of authority in Illinois and other jurisdictions suggested that “the rules of legal ethics do not establish a separate duty or cause of action.” 218 Ill.App.3d at 879, 161 Ill.Dec. at 490, 578 N.E.2d at 1136 . The court did agree with the holding in
 
 Rogers
 
 that the rules of legal ethics may be relevant to the standard of care, as an attorney’s duty to his client may originate in the basic principle embodied in a particular rule. However, it concluded that there is no |42“distinct cause of action” for “ethical malpractice” in Illinois, and that
 
 “rules of legal ethics ... are not an independent font of tort liability.”
 
 218 Ill.App.3d at 881, 161 Ill.Dec. at 492, 578 N.E.2d at 1138. (Emphasis supplied.)
 
 See also Skorek v. Przybylo,
 
 256 Ill.App.3d 288, 290-91, 195 Ill.Dec. 274, 276-77, 628 N.E.2d 738, 740-41 (1993).
 

 Finally, and most importantly for our purposes, the relevance of the
 
 Rogers
 
 case has been significantly diminished by the later Illinois case of
 
 Hanumadass v. Coffield, Ungaretti & Harris,
 
 311 Ill.App.3d 94, 243 Ill.Dec. 705, 724 N.E.2d 14 (1999), involving facts somewhat analogous to the present action. In that case, the plaintiff physician was employed by a county hospital and was sued, with the hospital and six other physicians, for medical malpractice. By ordinance, the state attorney’s office
 
 *834
 
 was authorized to assign the defense of the hospital and physicians to the defendant attorneys. The case was settled by the county, which paid the settlement and the defense attorneys’ fees. The plaintiff physician did not learn of the settlement until after he received a letter from the state medical disciplinary board, to which the settlement had been reported as required by law. The plaintiff physician sued the defendant attorneys for legal malpractice, alleging that an attorney-client relationship existed, that the defendants failed to competently represent and defend him, and that they failed to inform him of the settlement, thereby violating the Illinois Rules of Professional Conduct. The defendants filed a motion
 
 in limine
 
 prior to trial to bar any claim for damages for loss of reputation, emotional distress, and other nonpecuniary damages. The trial court granted the motion. Following trial, the jury found that the defendants were liable for legal malpractice for failing to notify the plaintiff physician of the settlement, but awarded only $1.00 in nominal damages. The plaintiff physician then appealed. The |4SappeIlate court affirmed the judgment, initially observing that the evidence did not show that the alleged emotional distress was foreseeable, and that under Illinois law, nonpecuniary damages such as emotional distress are recoverable “only when the attorney has reason to know that a breach of his fiduciary duty is likely to cause emotional distress, for reasons other than pecuniary loss.”
 
 Id.,
 
 311 Ill.App.3d at 100, 243 Ill.Dec. at 710, 724 N.E.2d at 19. The appellate court observed:
 

 In our view, the law firm in the case at bar acted to protect plaintiffs interests by obtaining a settlement that released and disclaimed him of liability, while requiring no contribution on his part. The law firm concedes that the failure to notify plaintiff may have been a mistake; however, we cannot say that such a mistake was so egregious as to warrant noneconomic damages.
 

 Id.,
 
 311 Ill.App.3d at 101, 243 Ill.Dec. at 711, 724 N.E.2d at 20.
 

 The court in
 
 Hcmmnadass
 
 also noted that “it is undisputed that the law firm had the authority to dispose of the [medical malpractice] action by settlement without plaintiffs approval even had plaintiff been notified by the law firm prior to the offer of settlement,” citing county ordinances authorizing such action.
 
 Id.,
 
 311 Ill.App.3d at 102, 243 Ill.Dec. at 711, 724 N.E.2d at 20. The court found that there was no evidence that the defendants caused the settlement report upon which the emotional distress claims were based, but that such report was sent automatically as required by law. The court concluded:
 

 In the absence of evidence that,
 
 but for the law firm’s failure to notify plaintiff of the settlement agreement,
 
 plaintiffs reputation would have remained intact, it is our view that the jury reasonably could have concluded that plaintiff sustained
 
 no actual, quantifiable damages
 
 as a result of the legal malpractice of the law firm.
 

 311 Ill.App.3d at 103, 243 Ill.Dee. at 712, 724 N.E.2d at 21. (Emphasis supplied.)
 

 hJn summary, we conclude that although the rationale of the
 
 Rogers
 
 case may be relevant for purposes of determining the existence of a duty in the duty-risk analysis, it is not persuasive in determining the existence of the elements of cause-in-fact, legal cause, or damages.
 

 Mitchum v. Hudgens,
 
 533 So.2d 194 (Ala.1988), was decided after
 
 Rogers
 
 and discussed
 
 Rogers
 
 in detail. The factual circumstances were very similar to those of
 
 Rogers
 
 and the present case. A medical malpractice suit was filed against
 
 *835
 
 Dr. Mitchum, an obstetrician. His professional liability insurer, St. Paul Fire and Marine Insurance Company, assigned the defense to Mr. Hudgens. The pertinent policy language governing defense and settlement was identical to that of the policy at issue in this case. Shortly before trial, the insurer agreed to settle the case. Dr. Mitchum sued his defense attorney, Mr. Hudgens, and the insurer, claiming that the settlement was made without his consent, thereby precluding “a possible vindication at trial.”
 
 Id.
 
 at 196. He claimed that he suffered damages to his professional reputation, loss of business, and impaired ability to obtain malpractice liability insurance. The attorney, Mr. Hudgens, moved for summary judgment, which was denied by the trial court, and Mr. Hud-gens appealed. Dr. Mitchum relied upon the authority of the
 
 Rogers
 
 case in contending that a conflict arose based upon the insured’s opposition to any settlement. While agreeing with the “general principles” regarding the attorney’s ethical duties enunciated in
 
 Rogers,
 
 the Alabama Supreme Court disagreed that an actual conflict of interest existed. The court explained:
 

 |W]e believe that the insurance contract does affect the attorney-client relationship with respect to settlement of an action brought against an insured. If the insured has contracted away the right to require his consent prior to a settlement of a claim against him, no real conflict of interest exists between the insured and the insurer, at least where the claim or settlement is |45within policy limits and there has been no reservation of rights by the insurer.
 

 Id.
 
 at 201.
 

 The court in
 
 Mitchum
 
 distinguished that case’s fact situation from those situations where the insurer has reserved its right to contest the existence or extent of coverage or where a potential for judgment in excess of the policy limits existed, on the grounds that the rationale for the insured’s interest in settlement in those situations was based upon the insured’s “direct financial stake in the litigation.”
 
 Id.
 
 at 202. The court explained:
 

 This is not to say that appointed counsel is under no ethical duty to make a full disclosure of the progress of the litigation to the insured. Certainly, appointed counsel should keep his client, the insured, apprised of all developments in the case, including settlement negotiations. Appointed counsel should also inform the insured of the reasons why he believes settlement is the best course of action. But
 
 merely failing to so inform the insured within the context of the present ease would not give rise to a cause of action for money damages in favor of the insured.
 
 [Citation omitted.]
 
 We hold that if the insured objects to a settlement of a claim, the attorney is not thereby precluded from negotiating a settlement at the direction of the insurer where the insurer has, by the terms of the policy, the exclusive right to settle or compromise claims against its insured. We hold further that an attorney who does so cannot be held liable to the insured for legal malpractice for failing to obtain the consent of the insured to settle the claim, because the insured, by contracting atuay the right to require such consent, has thereby impliedly consented to the settlement of claims against him, within policy limits, by appointed counsel at the direction of the insurer. It is for this very reason that Hudgens could not have proximately caused any of the damage Dr. Mitchum has alleged that he suffered as a result of the settlement of the [medical malpractice] suit without his consent.
 

 Id.
 
 (Emphasis supplied.) The court reversed the trial court’s judgment and
 
 *836
 
 granted summary judgment in favor of the defendant attorney, Mr. Hudgens.
 

 In the more recent California case of
 
 New Plumbing Contractors, Inc. v. Edwards, Sooy & Byron,
 
 99 Cal.App.4th 799, 121 Cal.Rptr.2d 472 (2002), a contractor insured under a comprehensive general liability Impolicy sued the law firm its insurer had retained to defend it in a construction defect case. Based upon the law firm’s recommendation, the insurer joined with other insurers in settling the case within its policy limits. The policy had provided that the insurer “may at [its] discretion investigate any ‘occurrence’ and settle any claim or ‘suit’ that may result.” The contractor alleged that the law firm failed to notify it of the settlement negotiations and failed to properly defend the action, ignoring defenses that would have absolved the contractor of any liability, thereby causing it to pay higher premiums, with lower coverage and higher deductibles, for coverage with financially weaker insurers. The trial court granted summary judgment in favor of the law firm on the issue of causation, reasoning that the insurer had the right to settle regardless of the case’s defensibility and without consulting its insured. The appellate court agreed, holding that since the insurer could settle without consulting its insured and over its objection, “counsel’s recommendation of settlement was not a cause of any harm the contractor may have suffered,” and that “causation was lacking as a matter of law.”
 
 Id.,
 
 99 Cal.App.4th at 802, 121 Cal.Rptr.2d at 474-5.
 

 A plaintiff can have no greater rights against attorneys for the negligent handling of a claim than are available in the underlying claim.
 
 Costello v. Hardy,
 
 03-1146, pp. 9-10 (La.1/21/04), 864 So.2d 129, 138;
 
 Holland v. Hornyak,
 
 07-394, p. 6 (La.App. 5th Cir.11/27/07), 971 So.2d 1227, 1231,
 
 writ denied,
 
 08-0333 (La.4/25/08), 978 So.2d 366. The underlying claim here was the medical malpractice action seeking monetary damages, and the defendants’ “handling” of that claim was its legal defense, assumed and exclusively controlled by St. Paul under the unambiguous terms of its policy. Because the underlying claim was for money damages covered under St. Paul’s policy, if the defendants’ malpractice resulted in a Lylarger monetary judgment or settlement than would have resulted but for the malpractice, it would seem that only St. Paul would be entitled to assert any grievance in that regard. At any rate, the specific context in which Dr. Teague’s present claim arose, and St. Paul’s role in it, cannot be ignored.
 

 The issue of causation was also addressed in
 
 Purdy v. Pacific Auto. Ins. Co.,
 
 157 Cal.App.3d 59, 203 Cal.Rptr. 524 (1984). The court aptly observed:
 

 A lawyer cannot properly compel a client to take his or her advice; a lawyer can strongly advise action by a client, action highly beneficial to the client or others, action clearly indicated by known facts, but there is no duty on the part of the client to follow the lawyer’s lead— that is not the nature of the relationship, assuming that the client is legally capable of acting on his own behalf. This reality is particularly evident ... where the lawyer defendants [are] advising a sophisticated business entity, an insurance company.... In our view, since a lawyer does not have the power to compel a client’s acts, the lawyer cannot be held responsible to others for
 
 failing
 
 to advise the client to act in a particular manner, as improper and as damaging to others as that action may turn out to be.
 

 The parties to a contract of compromise of a personal injury claim are the parties involved in the claim and any related litigation. While those parties may act
 
 *837
 
 through attorneys, their attorneys are not parties to their agreement. The ultimate decision to enter into a compromise belongs to the parties, not their legal counsel. Here, the ultimate decision to settle the malpractice case rested with St. Paul, and Dr. Teague failed to put forth any affirmative evidence at trial that St. Paul’s decision would more likely than not have been different but for the alleged acts of legal malpractice.
 
 [21]
 
 The adverse result of which he complains is the mediation and compromise of l4Sthe medical malpractice case, resulting in the reporting of the settlement to the Data Bank, not a trial and adverse judgment against him. It was thus incumbent upon Dr. Teague to show that but for the negligent loss of the right to jury trial, and his lost opportunity to hire independent counsel, the case against him would not have been settled by .St. Paul, but would have proceeded to trial. As Dr. Teague acknowledges St. Paul’s absolute right under its policy to compromise the medical malpractice claim, he was necessarily required to prove that but for the negligent loss of the right to jury trial and the defendants’ failure to inform him of that fact, St. Paul in its virtually unlimited discretion would not have opted to mediate and compromise the claim. He clearly failed to meet that burden.
 

 Where Dr. Teague’s alleged harm,
 
 i.e.,
 
 the supposed damage to his professional reputation and increased malpractice premiums due to the settlement of the malpractice claim, would have resulted irrespective of any alleged negligence on the defendants’ part, then that alleged negligence is not a substantial factor or a cause in fact and is therefore not actionable.
 
 See Executive Recruitment, Inc. v. Guste, Barnett & Shushan,
 
 538 So.2d 129, 131 (La.App. 4th Cir.1988),
 
 writ denied,
 
 535 So.2d 742 (La.1989).
 

 Let us assume hypothetically that the defendants informed Dr. Teague of the scheduled mediation. Let us further assume that Dr. Teague immediately informed them of his objection to the mediation and their participation therein. Then let us assume that, pursuant to Rule 1.16, the defendants would have withdrawn from the representation of both Dr. Teag-ue and St. Paul at that point, and that St. Paul would have then appointed separate counsel for itself and Dr. Teague. We will further assume that Dr. Teague immediately instructed his newly-appointed counsel to refuse to participate in the mediation and to oppose any settlement. If St. 149Paul would have elected to proceed with the mediation through its separate counsel and went on to settle the claim against Dr. Teague, despite his opposition, would Dr. Teague have had any viable cause of action against his newly-appointed counsel or St. Paul in that regard? No. Would he have any cause of action against the defendants, as his former counsel, because St. Paul proceeded with settlement? We think not. Suppose instead that Dr. Teague objected to the appointment of substitute counsel by St. Paul and hired his own attorney to defend his personal interests, but without waiving the benefit of St. Paul’s policy coverage.
 
 [22]
 
 Suppose that St. Paul never
 
 *838
 
 theless mediated and settled the claim within its coverage limits. Would Dr. Teague have had any viable cause of action against the defendants or St. Paul related to the settlement of the medical malpractice claim? No.
 

 Let us take this hypothetical situation a step further, presenting an analogous situation. Suppose that the plaintiff patient reserved her rights to proceed with a claim against the PCF, despite settling her claim against Dr. Teague and St. Paul for $50,000.00, less than the $100,000.00 policy limits representing Dr. Teague’s maximum personal exposure as a qualified health care provider.
 
 [23]
 
 Under the foregoing assumed facts, the settlement by St. Paul did not amount to a binding admission of Dr. Teague’s negligence against the PCF under the Medical Malpractice Act, and the plaintiff would be required to bring the claim against the PCF against Dr. Teague as the nominal defendant, even though he personally would have no actual |snexposure to any liability.
 
 [24]
 
 The PCF Oversight Board (PCF board) then retains counsel to defend the claim against the PCF, brought nominally against Dr. Teag-ue. The PCF board decides in its discretion to settle the claim against the PCF.
 
 [25]
 
 Dr. Teague, as nominal defendant and client of the defense counsel, objects to any settlement by the PCF and to “his” counsel’s participation and facilitation of any settlement, on the grounds that such settlement will further damage his professional reputation.
 

 In the foregoing hypothetical situation, the PCF board cannot appoint separate counsel to represent itself in the principal action, as technically it cannot be made a defendant in that action.
 
 [26]
 
 May the PCF board retain counsel to represent itself in its role as “statutory intervenor,” and use that counsel to effect settlement of the claim by the patient against Dr. Teague, as nominal defendant? Probably not, since an intervenor takes the proceedings as he finds them.
 
 [27]
 
 May the PCF board nevertheless settle the claim against the PCF, using Dr. Teague’s appointed counsel (over his objection), if it chooses to do so? Or would the PCF ultimately be stymied by the inability to appoint counsel to “represent” Dr. Teague without each successive appointed counsel’s being forced to withdraw from such representation? May Dr. Teague so obstruct the statutory scheme of the Act, which permits the PCF board to defend and to settle claims, yet retain the benefits of the special protection it affords him in derogation of the general tort law?
 
 [28]
 
 May |fl1Dr. Teague sue the PCF board’s appointed counsel, “his” attorney, for malpractice, if such counsel negotiates and participates in the settlement of the claim against the PCF?
 

 
 *839
 
 We raise the hypothetical issues and questions presented in the last-described scenario simply to reinforce a point. There is no logical distinction between the exclusive authority of a medical malpractice liability insurer, having no “consent to settle” provision in its policy, to compromise a claim against its insured and the PCF board’s exclusive authority to compromise á claim against the PCF, in the name of a health care provider. That authority cannot be impaired or circumvented through a collateral attack against the insurer’s or the PCF board’s appointed counsel, grounded upon a violation of the Rules of Professional Conduct. That being the case, it would seem that the insurer or the PCF board would similarly have the exclusive right to complain of any professional error that supposedly misled or coerced it into the exercise of its exclusive authority and discretion to settle.
 

 From the standpoint of the appointed counsel providing dual representation, it is quite a difficult matter to attempt to put such complex and conflicting legal and ethical considerations into actual practice within the adversarial arena of modern civil litigation. This is patent from the pronounced differences in opinion expressed by the opposing legal experts in medical malpractice insurance defense, both of whom were quite articulate, knowledgeable, and well-experienced.
 

 The required element of legal causation is clearly lacking.
 
 See, e.g., Bauer v. Dyer,
 
 00-1778, pp. 14-15 (La.App. 5th Cir.2/28/01), 782 So.2d 1133, 1141,
 
 writ denied,
 
 01-0822 (La.5/25/01), 793 So.2d 162. Accordingly, the trial court’s judgment against the defendants must be | .^reversed, and Dr. Teague’s cause of action dismissed on that basis. Our decision on this point is reinforced by our conclusion on the related issues discussed below.
 

 Dr. Teague’s Lost Opportunities
 

 The supreme court characterized Dr. Teague’s claimed damages as derivative of his loss of “the opportunity of hiring independent counsel to defend him in the malpractice claim against him”
 
 [29]
 
 and “the lost opportunity for a jury trial.”
 
 [30]
 
 This begs the more important question of whether the exercise of such opportunities would have had any practical effect on the immediate cause of his claimed damages, the mediation and settlement, which St. Paul had the unquestioned right to conclude in its discretion. And this consideration raises the related question of the value of those lost “opportunities”: without the ultimate right to control the settlement of the malpractice claim, what practical value could those “opportunities” have?
 

 As to the lost opportunity of hiring independent counsel, the Mississippi Supreme Court in
 
 Foster, supra,
 
 made certain observations particularly relevant for our consideration. The court initially observed that a liability insurer “undertakes to insure a person up to a specified sum of money caused by his negligence,” and that the insurer must protect “the
 
 monetary interest
 
 of the insured.”
 
 Foster,
 
 528 So.2d at 269. (Emphasis supplied.) The court further observed that “[i]f the damages claimed are within the policy limits, and there is no question of coverage, no potential problem to the [defense] lawyer exists.”
 
 Id.
 
 If an offer to settle within the policy limits is accepted by the insurer, “the insured cannot be
 
 monetarily
 
 harmed because he will not have to pay anything.”
 
 Id.
 
 at 270. (Emphasis |s3supplied.) Emphasizing that the attorney should accu
 
 *840
 
 rately inform both the insurer and the insured of the terms of any settlement offer within the policy limits, the court noted that “[i]f there is any
 
 objective
 
 reason for the insured to have additional legal counseling, defense counsel should promptly advise him to go and seek it.”
 
 Id.
 
 at 273. The court then significantly observed:
 

 Even though it may be to the insured’s monetary advantage for the carrier to accept the offer, he may still want the company to reject it. By no means infrequently the insured, because of his outrage over being sued for what he considers a merit less claim, will not want the carrier to pay anything, even though it poses some risk to him. [Citation omitted.] Here independent counsel might be helpful to an insured whose good judgment may be swayed by his emotion.
 

 Id.
 
 at 273 n. 12.
 

 The court in
 
 Foster
 
 then characterized the role of an insured’s independent counsel regarding an offer within the policy limits as “extremely limited” and possibly “superfluous,” explaining:
 

 When an offer to settle within the policy limits is made, the carrier has three options: accept, reject, or reject with a counter-offer.
 
 What options does the insured have?
 
 None. He can ask the company to settle, or
 
 ask it not to settle. He can do no more.
 
 Because his choice is limited to what he is going to request of the insurance carrier regarding this settlement offer,
 
 the usefulness of an independent counsel is likewise limited.
 
 On behalf of the insured, the lawyer can demand settlement. He may also be of some benefit persuading an insured who, for one reason or another does not want to settle, ... that it is in his best interest to demand settlement by the carrier.
 

 In any event it can be seen that the insured may not have suffered any loss by failing to consult independent counsel, if the only service such lawyer could give would be to demand the company to
 
 settle....
 

 Id.
 
 at 273. (Emphasis supplied.)
 

 We conclude that any lost opportunity to hire independent counsel had no inherent pecuniary value under these facts, and that Dr. Teague failed to prove at trial by a preponderance of the evidence the value of his lost opportunity for a jury trial. Thus, apart from the more important liability | ^issues of factual and legal causation, Dr. Teague did not prove he was entitled to damages for those lost opportunities.
 

 General Damages for Loss of “Constitutional Rights”
 

 Both in his petition and on appeal Dr. Teague has asserted a “constitutional right” to a trial by jury, and contends that “his constitutional rights were abridged” by the defendants’ “negligent and unprofessional conduct.” On that point, we note that there is no constitutional due process right to trial by jury in a civil case in Louisiana.
 
 Riddle v, Bickford,
 
 00-2408, p. 5 (La.5/15/01), 785 So.2d 795, 799;
 
 Judson v. Davis,
 
 04-1699, p. 23 (La.App. 1st Cir.6/29/05), 916 So.2d 1106, 1121,
 
 writ denied,
 
 05-1998 (La.2/10/06), 924 So.2d 167. In the course of oral argument in the supreme court, Dr. Teague’s counsel argued that “[o]ur constitutional rights are a valuable commodity” and that Dr. Teag-ue’s “constitutional right” to trial by jury was “stolen from him” by the defendants’ actions. We cannot agree with that characterization of the right to trial by jury as a property right. A procedural right to trial by jury has no intrinsic economic value, and cannot be bought or sold as a
 
 *841
 
 commodity.
 
 [31]
 
 And if it is truly the loss of the right to jury trial of which Dr. Teague complains, rather than St. Paul’s exercise of its discretionary right to settle, by what standards should a trier of fact determine the respective values of a lost opportunity for jury trial versus an existing opportunity for bench trial?
 
 [32]
 

 lfiHInsofar as it might also be argued or suggested that a civil defendant has a constitutional right to judicial resolution of a claim against him, regardless of whether a jury or bench trial is involved, we must again disagree. That precise issue, presented in a very similar context, was addressed in detail by the Kansas Supreme Court in
 
 Harrison v. Long,
 
 241 Kan. 174, 734 P.2d 1155 (Kan.1987).
 

 In
 
 Harrison,
 
 a physician challenged the constitutionality of the Kansas Health Care Provider Insurance Act (the Kansas Act), K.S.A. 40-3401,
 
 et seq.,
 
 after a medical malpractice claim against him was settled over his objection. The Kansas Act is quite similar in operation to that of the Louisiana Medical Malpractice Act, La, R.S. 40:1299.41,
 
 et seq.,
 
 with a primary medical malpractice liability policy backed by excess protection from a state-administered fund. The physician’s liability insurance policy did not contain a “consent to settle” clause, and the Kansas Act authorized the state insurance commissioner to negotiate settlement from the fund to settle without the physician’s consent (although the Kansas Act did not contain an explicit waiver or consent provision authorizing settlement without the health care provider’s consent). The physician contended that the Kansas Act deprived him of a “property right — the right to defend himself in court,” supported by that state’s constitutional right to access to the courts. The Kansas Supreme Court rejected that contention, observing |fifithat the due process clause of the United States Constitution’s Fourteenth Amendment “protects vested rights only,” and its protection has not been extended to such interests as “a right to a favorable advisory opinion” or “rights in a reputation.”
 
 Harrison,
 
 241 Kan. at 178, 734 P.2d at 1159. It also
 
 *842
 
 emphasized that “[t]here are no cases ... holding that the right to defend oneself in a civil case is a protected property interest.”
 
 Id.,
 
 241 Kan. at 179, 734 P.2d at 1159. The court therefore held that “[a] defendant has no constitutionally protected right to require that a plaintiffs action continue for the sole purpose of allowing the defendant to vindicate himself.”
 
 Id.,
 
 241 Kan. at 179, 734 P.2d at 1160.
 

 Noting that the Kansas Act provided certain procedural protections to the health care provider, the Kansas Supreme Court in
 
 Harrison
 
 also significantly held:
 

 It is the public policy of the State to assure an adequate supply of health care providers and provide protection to patients who may be injured as a result of medical malpractice. Under the Act, it is the Fund, not the provider, which is responsible for paying any difference above the coverage of the liability insurance.
 
 It is, therefore, implicit in the Act that the provider relinquish his right to prevent a settlement. To allow physicians to control the defense of malpractice claims against them and reach their own decisions to continue or to settle the action would undermine the whole purpose and the financial structure of the Act.
 

 Id.,
 
 241 Kan. at 181, 734 P.2d at 1160. (Emphasis supplied.)
 

 We agree with the above reasoning. Dr. Teague’s characterization of the supposed “wrongful” loss of an opportunity to vindicate himself at trial as rising to constitutional magnitude is unsupported by any legal analysis or authority. Insofar as Dr. Teague is claiming general damages for the loss of claimed “constitutional rights” to a trial, whether a jury trial or bench trial, he has failed to state a cause of action for such a loss under the facts presented.
 

 |
 
 ^Recovery of General (Nonpecuniary) Damages for Legal Malpractice
 

 Nationwide, the prevailing rule is that emotional distress claims are disallowed in legal malpractice actions. However, courts have established exceptions “when there is a loss of a fundamental right or the conduct of the attorneys foreseeably led to emotional harm even though there are no actual damages.” Anne Ryan,
 
 Emotional Distress Claims in Legal Malpractice Actions,
 
 13 No. 3 Prof. Law. 27, 28 (2002).
 

 Dr. Teague does not seriously dispute that the jury’s award represented only general or nonpecuniary damages, rather than special or economic damages. The record confirms that no corroborative evidence of his alleged economic losses was introduced at trial. Citing La. C.C. art. 1998, Dr. Teague argues that the professional relationship between his client and the defendants “was'designed to gratify a non-pecuniary interest, i.e., to protect his stature and reputation as a physician in the Baton Rouge community[.]” No evidence supporting such a mutual intent of the parties was presented at trial — only Dr. Teague’s own subjective interpretation of the scope and purpose of the legal representation, procured and paid for by St. Paul pursuant to its rights and duties under the policy. Dr. Teague’s interpretation of the scope of the defendants’ duties to him within the framework of the policy is plainly contradictory to its fundamental purpose. This contrived argument has no merit.
 

 Louisiana Civil Code article 1998 provides:
 

 Damages for nonpecuniary loss may be recovered when the contract, because of its nature, is intended to gratify a nonpecuniary interest and, because of the circumstances surrounding the formation or the nonperformance of the
 
 *843
 
 contract, the obligor knew, or should have known, that his failure to perform would cause that kind of loss.
 

 | ^Regardless of the nature of the contract, these damages may be recovered also when the obligor intended, through his failure, to aggrieve the feelings of the obligee.
 

 The professional relationship between Dr. Teague and the defendant attorneys derived exclusively from the insurance contract between him and St. Paul, and must necessarily be viewed in that context. The undisputed purpose of the insurance contract was the defense and resolution of monetary “professional liability claims” and “suits for damages” related to Dr. Teague’s professional practice. Dr. Teag-ue knew that the defendants were chosen by St. Paul to defend him in the medical malpractice claim within the terms and coverage of his policy. He cannot reasonably have assumed that the defendants’ duties to him extended beyond the scope of the policy terms and coverage provided by St. Paul, so as to include his supposed “objectives of representation” not covered by the policy.
 

 In
 
 Freeman v. Cohen,
 
 969 So.2d 1150 (Fl.App.2007), a physician was sued for medical malpractice, and his insurer and the plaintiffs agreed to settle the claim. The physician objected to the settlement, sending letters to his insurer, purporting to release his insurer from any obligations and to retroactively cancel his policy. The physician also filed a counterclaim seeking to declare the settlement invalid, as con-fected without his authority. The physician’s policy did not contain a “consent to settle” clause.
 
 [33]
 
 The court pointedly observed that “[t]he policy’s purpose was indemnification and a defense of covered claims, not to protect the insured from increases in|,Minsurance premiums or damage to his reputation from a paid claim.”
 

 [34]
 

 Id.
 
 at 1155.
 

 In the case of
 
 Jarrell v. Miller,
 
 38,360 (La.App. 2nd Cir.9/9/04), 882 So.2d 639,
 
 writ denied,
 
 04-2488 (La.12/17/04), 882 So.2d 868, the plaintiff sued his former attorney for legal malpractice, claiming that the attorney’s ethical violations resulted in the loss of his business’s corporate stock transferred to his wife in a partition of community property and related emotional distress. The trial court entered judgment on a jury verdict in the plaintiffs favor, awarding him lost earnings from his business, the value of the transferred stock, and $500,000.00 in general damages for emotional distress. The court of appeal reversed, finding that plaintiff failed to prove his alleged economic damages. With regard to the stock transfer drafted by the attorney, the court noted that the plaintiff directed the attorney to prepare
 
 *844
 
 the contract, did not even read it before he signed it, later sued his wife to attempt to recover the stock, then voluntarily dismissed that action on the assumption the stock had no value at the time. The court then addressed the general damages award, observing that “[djamages for pain, suffering, anxiety, and humiliation caused by negligence are generally not recoverable in a legal malpractice action,” since “the foreseeable result of an attorney’s negligence typically extends only to an economic loss.”
 
 Id.,
 
 38,360 at p. 11, 882 So.2d at 647. The court observed that limited exceptions to that general rule should exist where the original legal matter handled by the attorney did not result in economic loss, but significant personal interests, such as casesj^involving child custody or involuntary confinement, imprisonment, or other loss of personal liberty. Id., 38,360 at p. 12, 882 So.2d at 646. The court concluded that “[w]hile the outer boundaries of the law are not yet visible in Louisiana when dealing with emotional distress in legal malpractice cases,” such damages were not warranted in that case, despite the fact that many of the alleged ethical violations of the Rules of Professional Conduct were not seriously disputed by the defendants at trial.
 
 Id.
 

 Under the terms of St. Paul’s policy, Dr. Teague transferred or “gave away” the right to control the defense and settlement of the malpractice claim to St. Paul, just as the plaintiff in
 
 Jarrell
 
 transferred or “gave away” the corporate stock to his wife, thereby precluding recovery of its value by his own actions.
 
 See Jarrell,
 
 38,360 at pp. 8-9, 882 So.2d at 645.
 
 See also Costello v. Hardy,
 
 03-1146, p. 11 (La.1/21/04), 864 So.2d 129, 139, and
 
 Khan v. Richey,
 
 40,-805, pp. 11-12 (La.App. 2nd Cir.4/19/06), 927 So.2d 1267, 1274,
 
 writ denied,
 
 06-1425 (La.11/3/06), 940 So.2d 662.
 

 In the case of
 
 J-U-B Engineers, Inc. v. Security Ins. Co. of Hartford,
 
 146 Idaho 311, 193 P.3d 858 (2008), an engineering firm sued its professional liability insurer and the defense attorney retained to defend a negligence action against the firm. The firm claimed that the settlement agreement harmed its business reputation, making it more difficult to secure clients, and that its “reputation as an aggressive party to litigation” and “a pugnacious litigator” was also damaged. The Idaho Supreme Court affirmed summary judgment in favor of the defendant insurer and defense attorney, on the grounds that no admissible evidence of the claimed damages to reputation was shown. In doing so, however, that court expressed doubt as to whether “a party may claim damages to its reputation arising from legal malpractice.”
 
 Id.
 
 at 865.
 
 See also Hanumadass, supra.
 

 |mWe conclude that the award of general damages was not legally recoverable under the factual circumstances of this case, and this finding constitutes another reason warranting reversal of the trial court’s judgment.
 

 St. Paul’s Role as Alleged Third Party at Fault and Defendants’ Requested Jury Instructions
 

 The defendants also assigned as error the trial court’s failure to present the issue of St. Paul’s alleged causal negligence or fault to the jury on the verdict form. Louisiana Civil Code article 2323 requires the trier of fact in an action for delictual damages to determine the proportionate fault of all persons, including nonparties. The trial court’s legal error is obvious reversible error, which deprived the jury of a legal principle essential to the proper determination of the factual issues related to legal causation. Although our conclusion is
 
 dictum, in
 
 light of our substantive decision on the main issues, we include it in
 
 *845
 
 order to comply with the supreme court’s directive that we dispose of all assignments of error previously pretermitted.
 

 Significantly, St. Paul was the first named defendant in Dr. Teague’s original petition filed on November 3, 2000. Even more significantly, Dr. Teague expressly alleged, erroneously, that the policy issued to him by St. Paul contained “a Professional Liability Consent to Settle Endorsement requiring the consent of the physician to the settlement of any suit or claim,” and that St. Paul and the defendants failed to comply with that policy provision.
 
 [35]
 
 Dr. Teague further alleged that St. Paul initially incorrectly reported the settlement to the Data Bank as being based upon a claim of “surgery; wrong body part.” Finally, he alleged that St. Paul and Ms. Laufer engaged in other “intentional and negligent acts, practices, deceptions, and/or omissions,” including: “[b]reach of the duty of good faith and fair | fi2dealing owed to its insured”; “[b]reaeh of the duty to fully disclose material facts to its insured ... ”; conspiring with the defendants to conceal the defendants’ professional neglect; “[flailing to property] represent or protect the interests of its insured”; and “[flailing to properly and adequately investigate the claims asserted against its insured[.]” In their answer, the defendants affirmatively alleged that the “ultimate decision regarding settlement” was made by St. Paul in its discretion. Although Dr. Teague subsequently dismissed his claims against St. Paul and Ms. Laufer with prejudice, he never amended his petition to remove or amend the allegations in which he placed its negligence or fault at issue.
 

 Even if a liability insurer is not in bad faith in its evaluation of a claim or in refusing to settle a claim, it may still be found to be in bad faith for failure to keep its insured informed of the status of settlement negotiations and other developments affecting his excess exposure. The failure to do so may expose it to liability to its insured for all or part of any excess judgment, as well as his attorney’s fees incurred in protecting himself and in prosecuting his claim for consequential damages against his insurer.
 
 Lafauci v. Jenkins,
 
 01-2960, p. 13 (La.App. 1st Cir.1/15/03), 844 So.2d 19, 29,
 
 writ denied,
 
 03-0498 (La.4/25/03), 842 So.2d 403. Thus, a liability insurer has an
 
 independent
 
 duty to keep its insured informed of the status of settlement negotiations, apart from the professional duty of its appointed defense counsel to its insured. In the case of
 
 Pareti v. Sentry Indemnity Company,
 
 536 So.2d 417 (La.1988), the supreme court also emphasized that “[a]n insurer which hastily enters a questionable settlement [for its policy limits] simply to avoid further defense obligations under the policy clearly is not acting in good faith and may be held liable for damages [for an excess judgment] caused to its insured.”
 
 Id.
 
 at 423. Even where a settlement or | ,-¡other payment of the policy limits is made in good faith, “the insurer must make every effort to avoid prejudicing the insured by the time of its withdrawal from the litigation.”
 
 Id.
 

 It is certainly doubtful whether the foregoing legal principles would provide a basis for apportioning any liability upon St. Paul in the present context, where the settlement insulated Dr. Teague from any monetary loss for damages from the medical malpractice claim. Nevertheless, the trial court erred in failing to
 
 *846
 
 properly instruct the jury on the law applicable to St. Paul’s fiduciary duties and role in the settlement, as Dr. Teague placed them at issue in this litigation, and they remained a very relevant issue throughout the litigation and at trial.
 
 [36]
 
 For these reasons, the trial court erred in failing to give the defendants’ requested jury instructions related to the jurisdictional amount required for jury trial, the favored status of settlements, and St. Paul’s exclusive authority to settle the medical malpractice claim, and such failure is also reversible error.
 

 Because this court honors the juridical principle of judicial economy, we have conducted a
 
 de novo
 
 review of the pertinent facts before us in the record relating to St. Paul’s causal relationship to Dr. Teague’s claimed damages.
 
 See Gonzales v. Xerox Corp.,
 
 254 La. 182, 320 So.2d 163 (1975). To the extent that Dr. Teague may have suffered any damages, we conclude, for the reasons we have previously explained, that St. Paul’s actions in opting to settle the medical malpractice action, whether negligent or not, constituted an intervening and superseding cause, relieving the defendants of any liability.
 

 |
 
 MLiability of Mr. Zuber
 

 The issue of Mr. Zuber’s fault and liability has been rendered moot by reason of our determination of the main issues. But we include the following
 
 dictum
 
 to comply with the supreme court’s directive remanding this matter for our consideration.
 

 Mr. Zuber never withdrew as Dr. Teag-ue’s attorney of record, and the evidence supports Dr. Teague’s assumption that Mr. Zuber was representing him with Ms. No-bile’s assistance throughout the medical malpractice litigation. Mr. Zuber was a partner in a limited liability partnership, and Ms. Nobile was his subordinate partner at the time of the litigation at issue. Their testimony confirmed that Mr. Zuber had the authority to assign the handling of the medical malpractice litigation, or certain aspects of it, to Ms. Nobile.
 
 See
 
 La. R.S. 9:3431(B) and Louisiana State Bar Association Articles of Incorporation, Article 16, Rule 5.1(c), Rules of Professional Conduct. Accordingly, a factual basis existed upon which Mr. Zuber’s liability, whether independent or vicarious, could be found, and the jury’s finding does not appear to us to be manifestly erroneous. Again, however, we emphasize that our conclusion on this point has no bearing on the ultimate disposition of this appeal in favor of the defendants.
 

 PEREMPTORY EXCEPTION
 

 Following the supreme court’s remand of this matter, the defendants filed a peremptory exception raising the objections of no right of action and no cause of action.
 

 The purpose of the peremptory exception of no cause of action is to determine the sufficiency in law of the petition, in terms of whether the law extends a remedy to anyone under the petition’s factual allegations.
 
 Id.
 
 Generally, no evidence may be introduced to support or controvert the ] ^exception. La. C.C.P. art. 931. However, Louisiana jurisprudence recognizes an exception to this rule, whereby evidence admitted without objection may be considered by the court as enlarging the pleadings.
 
 Stroscher v. Stroscher,
 
 01-2769, p. 3 (La.App. 1st Cir.2/14/03), 845 So.2d 518, 523. Any doubts are resolved in favor of the sufficiency of the petition.
 
 Id.
 
 If two or more causes of action are based on separate and
 
 *847
 
 distinct operative facts, the court may sustain the exception in part, while preserving other causes of action sufficiently pleaded.
 
 Everything On Wheels Subaru, Inc. v. Subaru South, Inc.,
 
 616 So.2d 1234, 1242 (La.1993).
 

 The function of an exception of no right of action is a determination of whether the plaintiff belongs to the class of persons to whom the law grants the cause of action asserted in the petition.
 
 Badeaux v. Southwest Computer Bureau, Inc.,
 
 05-0612, p. 6 (La.3/17/06), 929 So.2d 1211, 1216-17. In other words, the focus in an exception of no right of action is on whether the particular plaintiff has a right to bring the suit.
 
 Badeaux,
 
 05-0612 at p. 6, 929 So.2d at 1216. Evidence may be received under the exception of no right of action for the purpose of showing that the plaintiff does not possess the right he claims or that the right does not exist.
 
 Teachers’ Ret. Sys. of La. v. La. State Employees’ Ret. Sys.,
 
 456 So.2d 594, 597 (La.1984). Thus, to prevail on the exception of no right of action, the defendant must show that the plaintiff does not have an interest in the subject matter of the suit or legal capacity to proceed with the suit.
 
 Talbot v. C & C Millworks, Inc.,
 
 97-1489, pp. 3-4 (La.App. 1st Cir.6/29/98), 715 So.2d 153, 155. Where doubt exists regarding the appropriateness of an objection of no right of action, it is to be resolved in favor of the plaintiff.
 
 Teachers’ Ret. Sys. of La.,
 
 456 So.2d at 597.
 

 | fifiAs we conclude that the relevant issues are more appropriately determined through full consideration of those issues on the merit s, as directed by the supreme court, we chose not to base our decision upon the related issues raised by the defendants’ exception. While the objection of no cause of action might have merit with regard to Dr. Teague’s assertion of loss of “constitutional rights” as an element of damages, he arguably has stated a cause of action in other respects. Likewise, as the client in an attorney-client relationship, he surely belongs to the class of persons entitled to assert a legal malpractice claim, an issue apart from the actual merits of any such claim. While Dr. Teague may not have a right of action to complain of the fact that the settlement was made without his consent, he arguably had the right of action as a client to assert other acts of legal malpractice, whether meritorious or not. At any rate, to the extent that we are called upon to determine the exceptions, we overrule them on the grounds that our decision on the merits renders their determination moot.
 

 CONCLUSION
 

 Our decision herein should not be construed as condoning in any way the defendant attorneys’ failure to timely post the jury bond or their ethical failure to keep Dr. Teague informed as to the procedural developments relating to the scheduled trial or to the mediation. In summary, the determination of whether actionable legal malpractice exists in this case ultimately rests upon the true character of the supposed conflict of interest between Dr. Teague and the defendants and legal causation. As the court did in
 
 Mitchum,
 
 we conclude no actual conflict existed as to the resolution of the monetary claim for damages against Dr. Teague, as Dr. Teague contractually delegated to St. Paul his right as a client to give his informed consent to the settlement.
 

 |fi7Not only did Dr. Teague not possess the right to oppose St. Paul’s settlement, he failed to prove that the defendants’ malpractice or breach of ethical duties was the legal cause of his claimed damages related to St. Paul’s settlement of the case. We accordingly reverse the trial court’s judgment in favor of the plaintiff-appellee,
 
 *848
 
 Michael A. Teague, M.D., and against the defendants-appellants, and dismiss Dr. Teague’s cause of action with prejudice. All costs of this appeal are assessed to the plaintiff-appellee.
 

 EXCEPTION OVERRULED; REVERSED AND RENDERED.
 

 WELCH and KUHN, JJ., concur without reasons.
 

 [1]
 

 .
 
 Teague v. St. Paul Fire & Marine Ins. Co.,
 
 06-1266, pp. 2-6 (La.App. 1st Cir.6/8/07), 964 So.2d 1015, 1016-18,
 
 reversed,
 
 07-1384, pp. 2-6 (La.2/1/08), 974 So.2d 1266, 1268-71.
 

 [2]
 

 . St. Paul was not named as defendant in the medical malpractice action, but assumed and directed its defense.
 

 [3]
 

 . The PCF is responsible, with certain limitations, for that portion of a medical malpractice claim exceeding $100,000.00. St. Paul provided the primary $100,000.00 of professional liability coverage for Dr. Teague.
 
 See
 
 n. 23,
 
 infra.
 

 [4]
 

 . St. Paul and Ms. Laufer were subsequently dismissed from the suit.
 

 [5]
 

 .
 
 See
 
 45 C.F.R. §§ 60.1-60.14. The National Practitioner Data Bank for Adverse Information .on Physicians and Other Health Care Practitioners was established by the U.S. Department of Health and Human Services under the authority of the Health Care Quality Improvement Act of 1986, 42 U.S.C. §§ 11101,
 
 et seq.
 
 The purpose of the Data Bank is "to collect and release certain information relating to the professional competence and conduct of physicians, dentists and other health care practitioners.” 45 C.F.R. § 60.1. Any insurance company which makes a payment under a policy "for the benefit of a physician, dentist or other health care practitioner in settlement of or in satisfaction in whole or in part of a claim or a judgment” for malpractice must report certain information regarding the claim and payment to the Data Bank, 45 C.F.R. § 60.7. However, any settlement payment "shall not be construed as creating a presumption that medical malpractice has occurred.” 45 C.F.R. § 60.7(d).
 

 [6]
 

 . The jury verdict form did not provide for categorization of the damages, but provided only one blank to be completed with the monetary amount of all damages.
 

 [7]
 

 .
 
 Teague,
 
 06-1266 (La.App. 1st Cir.6/8/07), 964 So.2d 1015.
 

 [8]
 

 . Although the language of the provision of St. Paul's policy at issue differs slightly from that of the policy in
 
 Employers' Surplus Lines,
 
 the same interpretation is warranted.
 
 See
 
 McKenzie & Johnson,
 
 supra,
 
 § 218 n. 1.
 

 [9]
 

 . Addressing the issue of recoverable damages in his brief to this court, Dr. Teague’s counsel admits that Dr. Teague "had no financial risk whatsoever because he was fully insured under the terms and conditions of the Louisiana Medical Malpractice Act” and that "[ejven if the matter had been tried with a multi-million dollar award having been rendered against Dr. Teague, he would not have paid a single penny!”
 

 [10]
 

 . In the case of
 
 Office of Comm'r of Ins. v. Hartford Fire Ins. Co.,
 
 623 So.2d 37 (La.App. 1st. Cir.1993),
 
 writ denied,
 
 93-2125 (La.4/7/94), 635 So.2d 1131, the Patient’s Compensation Fund (PCF) sued a medical malpractice insurer who settled a claim against its insured, alleging that it violated its duties toward the PCF. Its suit was filed over a year after the settlement. This court held that La. R.S. 40:1299.44(C)(7) did not create a fiduciary relationship between the health care provider's insurer and the PCF, and that any cause of action on the part of the PCF was delictual in nature.
 
 Id.
 
 at 40. We therefore affirmed the trial court’s judgment sustaining the insurer’s exception of prescription. In doing so, we declined to address the issue of whether a violation of La. R.S. 40:1299.44(C)(7) provides a basis for a cause of action for damages.
 
 Id.
 
 at 40 n. 7.
 

 [11]
 

 .
 
 Teague,
 
 07-1384 at p. 14, 974 So.2d at 1276.
 

 [12]
 

 .
 
 Teague,
 
 07-1384 at p. 10, 974 So.2d at 1273.
 

 [13]
 

 .
 
 Teague,
 
 07-1384 at p. 16, 974 So.2d at 1277.
 

 [14]
 

 . In his brief, Dr. Teague interprets the supreme court's opinion as conclusive on the issue of whether he "met his burden of proving legal malpractice ... (which, by definition, necessarily includes 'loss caused by that negligence’).” That portion of the dictionary definition of "malpractice” quoted by the supreme court makes no mention of resulting loss or damage.
 
 Teague,
 
 07-1384 at p. 6, 974 So.2d at 1271,
 
 citing Black's Law Dictionary
 
 959 (6th ed.1997). The definition in the current edition of that reference work defines "malpractice,” in pertinent part, as follows:
 

 An instance of negligence or incompetence on the part of a professional. To succeed in a malpractice claim, a plaintiff must also prove proximate cause and damages.
 
 legal malpractice.
 
 A lawyer’s failure to render professional services with the skill, prudence, and diligence that an ordinary and reasonable lawyer would use under similar circumstances.
 

 Black's Law Dictionary
 
 978 (8th ed.2004). (Citations omitted.) At any rate,
 
 Black’s Law Dictionaiy
 
 is not a source of substantive law in this state.
 

 [15]
 

 .
 
 Teague,
 
 07-1384 at p. 1, 974 So.2d at 1268.
 

 [16]
 

 . 07-1384 at p. 10 n. 3, 974 So.2d at 1273 n. 3.
 

 [17]
 

 . “Basically, the attorney must exercise reasonable care under the circumstances ... [A]n attorney is only bound to exercise reasonable care.” 21 Frank L. Maraist,
 
 et al., Louisiana Civil Law Treatise: Louisiana Law-yering
 
 § 18.4 (2007).
 

 [18]
 

 .
 
 See also
 
 Douglas L. Getter,
 
 Standard of Care in Malpractice Actions Against Insurance Defense Counsel: Inapplicability of the Code of Professional Responsibility,
 
 51 Fordham L.Rev. 1317 (1983).
 
 But cf.
 
 John A. Hollis-ter,
 
 St. Matthew on Masters and Servants: Pro-legomena to Conceptual Bases for Analyses of Louisiana Lawyers’ Permissible and Impermissible Conflicts of Interest, Faculty Symposium: An Evaluation of Cutting-Edge Issues,
 
 22 S.U.L.Rev. 283, 283-90 (1995).
 

 [19]
 

 . In the California case of
 
 Lysick v. Walcom,
 
 258 Cal.App.2d 136, 65 Cal.Rptr. 406 (1968), a judgment in excess of a liability insurer’s policy limits was rendered against die insured's estate in a wrongful death action. The insured's estate then assigned to the plaintiffs its claims against the insurer for bad-faith refusal to settle and its defense counsel for negligence. Addressing the claim against the defense counsel, the court pointedly observed that the degree of professional care "is related to the
 
 specific situation
 
 in which the attorney finds himself and the standard [of care] is that of ordinary care under the circumstances of the
 
 particular case
 
 governed by the established standards of professional ethics[.]”
 
 Id..,
 
 258 Cal.App.2d at 149, 65 Cal.Rptr. at 415 (Emphasis supplied.) The court also explained that "[i]t is important to note ... that where an attorney is employed to represent both the insurance company and the insured his duty is commensurate with the extent of his employment."
 
 Id.
 

 [20]
 

 .
 
 See, e.g., Radcliffe 10, L.L.C. v. Zip Tube Sys. of La., Inc.,
 
 07-1801, p. 10 (La.App. 1st Cir.8/29/08), 998 So.2d 107, 115,
 
 writs denied,
 
 09-0011, 09-0024 (La.3/13/09), 5 So.2d 119, 120, where this court held that the Code of Judicial Conduct does not provide an independent legal basis for recusal of a judge, distinct from the mandatory grounds for recu-sal set forth in La. C.C.P. art. 151.
 

 [21]
 

 . Neither Ms. Laufer nor any other representative of St. Paul was called to testify at trial, and the basis for their dismissal as defendants (whether due to compromise or voluntary dismissal) is not apparent from the record. Given the factual background and legal issues, the dismissal of St. Paul and Ms. Laufer from this litigation may have been a calculated strategic decision intended to divert the trier of fact's attention at trial from St. Paul's undisputed, absolute right to settle the medical malpractice claim and its role in doing so, and to instead focus and magnify attention on the defendants' admitted error in failing to post the jury bond and ethical lapse in failing to keep Dr. Teague informed.
 

 [22]
 

 . We consider it doubtful that Dr. Teague could validly waive the benefit of that cover
 
 *838
 
 age as a qualified health care provider after the medical malpractice claim was filed, after he received the benefit of the mandatory statutory medical review panel procedure, and after the claim was asserted against and coverage and defense accepted by St. Paul as primary insurer pursuant to the Medical Malpractice Act.
 
 See also
 
 the Louisiana Direct Action Statute, La. R.S. 22:655.
 

 [23]
 

 .
 
 See
 
 La. R.S. 40:1299.42(D)(5).
 

 [24]
 

 .
 
 See
 
 La. R.S. 40:1299.44(C)(5)(e).
 

 [25]
 

 .
 
 See
 
 La. R.S. 40:1299.44(A)(5)(b).
 

 [26]
 

 .
 
 See Williams v. Kushner,
 
 449 So.2d 455, 458 (La.1984).
 

 [27]
 

 .
 
 See
 
 La. C.C.P. art. 1094, Official Revision Comments — 1960, and
 
 Dodson v. Cmty. Blood Ctr. of La., Inc.,
 
 633 So.2d 252, 256 (La.App. 1st Cir.1993),
 
 writs denied,
 
 93-3158, 93-3174 (La.3/18/94), 634 So.2d 850, 851.
 

 [28]
 

 .
 
 See Hairison v. Long,
 
 241 Kan. 174, 180-81, 734 P.2d 1155, 1160-61 (Kan.1987), discussed
 
 infra.
 

 [29]
 

 .
 
 Teague,
 
 07-1384 at p. 10, 974 So.2d at 1273.
 

 [30]
 

 .
 
 Teague,
 
 07-1384 at p. 15, 974 So.2d at 1277.
 
 See
 
 n. 32,
 
 infra.
 

 [31]
 

 . A commodity is “an article of trade or commerce” or "[a]n economic good,” and the term “embraces only tangible goods, such as products or merchandise, as distinguished from services.”
 
 Black's Law Dictionary
 
 291 (8th ed.2004).
 

 [32]
 

 . We cannot help but observe that throughout the trial and the subsequent appeal hearings in this matter, Dr. Teague seems to take for granted the fact that the loss of the right to trial by jury, thereby making Judge Clark the trier of fact, provoked the mediation and settlement because it seemingly made an adverse decision a foregone conclusion. In order for the substitution of the trial judge for a jury to have a practical negative effect, and to amount to actionable malpractice resulting in damages, the likelihood or even inevitability of an adverse decision on liability or damages by that trial judge (as contrasted with a jury) must be presupposed. But the only evidence Dr. Teague offered supporting such assumptions was Ms. Nobile's correspondence to St. Paul describing Judge Clark as "notoriously plaintiff-oriented,” her testimony that Judge Clark's status as trier of fact was “a factor” in the decision to mediate, and Mr. Mang’s testimony that Judge Clark had a reputation among attorneys of being “somewhat plaintiff[-]oriented” and his personal opinion that she was philosophically “leaning to the plaintiff’s side.” No direct, competent evidence, in the form of objective proof of bias or prejudgment by the trial judge, was presented. We decline to entertain such a clearly speculative assumption as to the impartiality and objectivity of the trial judge. To do so would be analogous to uncritical acceptance of the questionable “statistics” underlying the recent, notorious article (challenged and largely discredited) relating to the supposed influence of campaign contributions to justices of the supreme court.
 
 See The Louisiana Supreme Court in Question: An Empirical and Statistical Study of the Effects of Campaign Money on the Judicial Function,
 
 82 Tul.L.Rev. 1291 (March 2008).
 

 [33]
 

 . Interestingly, as pointed out by the court in
 
 Freeman,
 
 Florida law specifically requires liability insurance policies to include "a clause authorizing the insurer ... to determine, to make, and to conclude,
 
 without the pennission of the insured,
 
 any ... settlement offer, ... if the offer is within the policy limits [,]" on the grounds that
 
 “[i]t is against public policy for any insurance ... policy to contain a clause giving the insured the exclusive right to veto any ... settlement offer, ...
 
 when such offer is within the policy limits.” Fla. Stat. § 627.4147(1 )(b)l. (Emphasis supplied.)
 

 [34]
 

 . In the earlier case of
 
 Rogers v. Chicago Ins. Co.,
 
 964 So.2d 280 (Fl.App.2007), cited by the same court in
 
 Freeman,
 
 a physician sued his malpractice liability insurer, claiming that it failed to properly investigate a malpractice claim against him and settled that "completely defensible” claim, resulting in the nonre-newal of his policy and higher premiums. The court held that the insured's interests and rights under the policy did not include "some collateral effect unconnected with the claim,” such as increased malpractice premiums. 964 So.2d at 284.
 

 [35]
 

 . In making this unsubstantiated and patently merit less allegation. Dr. Teague inadvertently but implicitly acknowledged the critical importance of the absence of a “consent to settle” clause to his claims against both St. Paul and the defendants.
 

 [36]
 

 . See our previous discussion,
 
 supra,
 
 on St. Paul's exclusive authority to settle the medical malpractice claim.